*Solicitation Version*

**IMPORTANT: THE SOLICITATION MATERIALS ACCOMPANYING THIS PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). THE DEBTORS EXPECT TO SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THIS PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OSG Group Holdings, Inc., *et al.*,[1] | Case No. 22-[_____] ([___]) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF OSG GROUP HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: OSG Group Holdings, Inc. (0311); OSG Intermediate Holdings, Inc. (1288); OSG Holdings, Inc. (2036); Output Services Group, Inc. (8044); Globalex Corporation (5365); SouthData, Inc. (5336); DoublePositive Marketing Group, Inc. (8221); National Business Systems, Inc. (6946); NCP Solutions, LLC (5620); The Garfield Group, Inc. (9966); Mansell Group Holding Company (9354); Diamond Marketing Solutions Group, Inc. (3531); Applied Information Group, Inc. (7381); Microdynamics Corporation (0423); Mansell Group, Inc. (7898); National Data Services of Chicago, Inc. (9009); Microdynamics Group Nebraska, Inc. (5711); Microdynamics Transactional Mail, LLC (4060); JJT Enterprises, Inc. (dba Optimal Outsource) (7792); Words, Data and Images, LLC (dba Gabriel Group) (2248). Globalex Corporation's service address is 150 S Pine Island Road, Suite 300, Plantation, FL 33324. DoublePositive Marketing Group, Inc.'s, Mansell Group Holding Company's, Diamond Marketing Solutions Group, Inc.'s, Applied Information Group, Inc.'s, and Microdynamics Corporation's service address is 900 Kimberly Drive, Carol Stream, IL 60188. SouthData, Inc.'s service address is 201 Technology Lane, Mount Airy, NC 27030. National Business Systems, Inc.'s service address is 9201 E Bloomington Fwy, Ste LL, Bloomington, MN 55420. NCP Solutions, LLC's service address is 5200 East Lake Boulevard, Birmingham, AL 35217. JJT Enterprises, Inc. (dba Optimal Outsource)'s service address is 7 Rancho Circle, Lake Forest, CA 92630. Words, Data and Images, LLC (dba Gabriel Group)'s service address is 3190 Rider Trail South, Earth City, MO 63045. OSG Group Holdings, Inc.'s, OSG Intermediate Holdings, Inc.'s, OSG Holdings, Inc.'s, Output Services Group, Inc.'s, The Garfield Group, Inc.'s, Mansell Group, Inc.'s, National Data Services of Chicago, Inc.'s, Microdynamics Group Nebraska, Inc.'s, and Microdynamics Transactional Mail, LLC's service address is 775 Washington Avenue, Carlstadt, NJ 07072.

**ROPES & GRAY LLP**
Gregg M. Galardi, Esq. (No. 2991)
Cristine Pirro Schwarzman, Esq. (*pro hac vice* pending)
Kevin Liang, Esq. (*pro hac vice* pending)
Eric M. Sherman, Esq. (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 596-9000
Facsimile:   (212) 596-9090
E-mail:  gregg.galardi@ropesgray.com
         cristine.schwarzman@ropesgray.com
         kevin.liang@ropesgray.com

- and -

**ROPES & GRAY LLP**
Stephen L. Iacovo, Esq. (*pro hac vice* pending)
Lucas Smith, Esq. (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone:  (312) 845-1200
Facsimile:   (312) 845-5500
E-mail:  stephen.iacovo@ropesgray.com
         luke.smith@ropesgray.com

**BAYARD, P.A.**
Erin R. Fay, Esq. (No. 5268)
Gregory J. Flasser, Esq. (No. 6154)
Maria Kotsiras, Esq. (No. 6840)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:  efay@bayardlaw.com
         gflasser@bayardlaw.com
         mkotsiras@bayardlaw.com

*Proposed Counsel for Debtors and Debtors in Possession*

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME ................................................................................... 1

Section 1.1  *Defined Terms* ........................................................................... 1
Section 1.2  *Rules of Interpretation and Computation of Time* .............. 24

ARTICLE II. UNCLASSIFIED CLAIMS ................................................................. 25

Section 2.1  *Administrative Claims* ............................................................ 26
Section 2.2  *Priority Tax Claims* ................................................................ 26
Section 2.3  *Professional Fee Claims* ........................................................ 27
Section 2.4  *DIP Claims* ............................................................................. 28
Section 2.5  *Statutory Fees* ........................................................................ 28

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....... 29

Section 3.1  *Classification of Claims.* ........................................................ 29
Section 3.2  *Class Identification* ................................................................ 29
Section 3.3  *Treatment and Voting Rights of Claims and Interests* ......... 30
Section 3.4  *Special Provision Governing Unimpaired Claims* ............... 35
Section 3.5  *Voting; Presumptions; Solicitation* ....................................... 35
Section 3.6  *Nonconsensual Confirmation* ................................................ 36
Section 3.7  *Subordinated Claims* .............................................................. 36
Section 3.8  *Vacant Classes* ....................................................................... 36
Section 3.9  *Intercompany Interests* .......................................................... 36
Section 3.10 *No Waiver* .............................................................................. 36

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................... 36

Section 4.1  *Compromise or Settlement of Controversies* ....................... 36
Section 4.2  *Sources of Consideration for Plan Distribution* .................. 37
Section 4.3  *Restructuring Transactions* ................................................... 38
Section 4.4  *Continued Corporate Existence* ............................................ 38
Section 4.5  *Corporate Action* ................................................................... 39
Section 4.6  *Vesting of Assets* .................................................................... 39
Section 4.7  *Indemnification Provisions in Organizational Documents* ... 40
Section 4.8  *Cancellation of Existing Securities and Agreements* .......... 40
Section 4.9  *Cancellation of Certain Existing Security Interests* ............. 41
Section 4.10 *The Amendment and Restatement; Exchange.* ...................... 42
Section 4.11 *The Sponsor Contributions* ................................................... 43
Section 4.12 *Approval of the Amended and Restated First Lien Facility, the Amended
and Restated First Lien Documents, the New Mezzanine Debt Facility, and
the New Mezzanine Debt Documents* ................................................... 43

i

Section 4.13  *Treatment of the Existing Second Lien Non-Debtor Obligor Guaranties, and the Existing Second Lien Non-Debtor Obligor Liens* ................................... 44
Section 4.14  *Issuance of the New Convertible Preferred Equity and the Reorganized Common Equity* ................................................................................ 45
Section 4.15  *Contingent Value Rights Pool* ............................................................... 45
Section 4.16  *Exit Capital* ........................................................................................... 46
Section 4.17  *Sponsor Globalex Interest and Globalex Secured Note* ...................... 46
Section 4.18  *UK DB Plan* .......................................................................................... 47
Section 4.19  *Vox Contribution* ................................................................................... 47
Section 4.20  *Exemption from Registration Requirements* ......................................... 48
Section 4.21  *Organizational Documents* ................................................................... 48
Section 4.22  *Exemption from Certain Transfer Taxes and Recording Fees* ............. 48
Section 4.23  *Managers, Directors and Officers of the Reorganized Debtors* .......... 49
Section 4.24  *Management Incentive Plan* .................................................................. 49
Section 4.25  *Effectuating Documents; Further Transactions* ................................... 49
Section 4.26  *Restructuring Expenses* ........................................................................ 50
Section 4.27  *Retained Causes of Action* ................................................................... 50
Section 4.28  *No Claims Under Existing Intercreditor Agreement* ........................... 51

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................... 51

Section 5.1  *Assumption of Executory Contracts and Unexpired Leases* .................. 51
Section 5.2  *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ........ 52
Section 5.3  *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ........... 53
Section 5.4  *Indemnification Obligations* ................................................................... 53
Section 5.5  *Contracts and Leases Entered Into After the Petition Date* .................. 53
Section 5.6  *Insurance Policies* .................................................................................. 53
Section 5.7  *Reservation of Rights* ............................................................................. 54

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 54

Section 6.1  *Distribution on Account of Claims and Interests Allowed as of the Effective Date* ............................................................................... 54
Section 6.2  *Distribution on Account of Claims and Interests Allowed After the Effective Date* ............................................................................... 54
Section 6.3  *Delivery of Distributions* ........................................................................ 55
Section 6.4  *Minimum Distributions* ........................................................................... 56
Section 6.5  *Foreign Currency Exchange Rate* .......................................................... 56
Section 6.6  *Delivery of Distributions; Undeliverable Distributions* ........................ 56
Section 6.7  *Compliance with Tax Requirements/Allocations* ................................... 57
Section 6.8  *Surrender of Cancelled Instruments or Securities* ................................ 58
Section 6.9  *Claims Paid or Payable by Third Parties* .............................................. 58

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR
                    INTERESTS ................................................................................ 59

Section 7.1     *Resolution of Disputed Claims Process* .................................................. 59
Section 7.2     *Allowance of Claims and Interests* ....................................................... 59
Section 7.3     *Prosecution of Objections to Claims* ..................................................... 60
Section 7.4     *Adjustment to Claims and Interests Without Objection* ...................................... 60
Section 7.5     *Disallowance of Certain Claims* ......................................................... 60
Section 7.6     *Offer of Judgment* ...................................................................... 60
Section 7.7     *Amendments to Claims or Interests* ...................................................... 61

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ......................... 61

Section 8.1     *Conditions Precedent to the Effective Date* .............................................. 61
Section 8.2     *Waiver of Conditions Precedent* ......................................................... 64
Section 8.3     *Effect of Failure of Conditions Precedent* ............................................... 64
Section 8.4     *Substantial Consummation of Plan* ...................................................... 64

ARTICLE IX. EFFECT OF PLAN CONFIRMATION ............................................. 64

Section 9.1     *Binding Effect* .......................................................................... 64
Section 9.2     *Discharge of Claims and Termination of Interests; Compromise and
                Settlement of Claims, Interests, and Controversies* ...................................... 65
Section 9.3     *Releases* ................................................................................ 65
Section 9.4     *Exculpation and Limitation of Liability* .................................................. 69
Section 9.5     *Injunction* .............................................................................. 71
Section 9.6     *Setoffs and Recoupment* ................................................................ 71
Section 9.7     *Release of Liens* ........................................................................ 72

ARTICLE X. RETENTION OF JURISDICTION ................................................. 72

ARTICLE XI. MISCELLANEOUS PROVISIONS ................................................ 75

Section 11.1    *Immediate Binding Effect* ............................................................... 75
Section 11.2    *Payment of Statutory Fees* .............................................................. 75
Section 11.3    *Amendments* ........................................................................... 75
Section 11.4    *Revocation or Withdrawal of Plan* ...................................................... 76
Section 11.5    *Governing Law* ......................................................................... 76
Section 11.6    *Successors and Assigns* ................................................................. 76
Section 11.7    *No Successor Liability* .................................................................. 76
Section 11.8    *Severability* ............................................................................ 77
Section 11.9    *Filing of Additional Documents* ......................................................... 77
Section 11.10   *Reservation of Rights* ................................................................... 77
Section 11.11   *Service of Documents* ................................................................... 77
Section 11.12   *Section 1125(e) of the Bankruptcy Code* ................................................. 80
Section 11.13   *Tax Reporting and Compliance* .......................................................... 81
Section 11.14   *Exhibits, Schedules, and Supplements* ................................................... 81

Section 11.15  *Entire Agreement* ................................................................................................ 81
Section 11.16  *Allocation of Payments* ...................................................................................... 81
Section 11.17  *Prepayment.* ......................................................................................................... 81
Section 11.18  *Conflicts* ............................................................................................................... 81
Section 11.19  *Closing of Chapter 11 Cases* ............................................................................ 82
Section 11.20  *Term of Injunctions or Stays* ........................................................................... 82

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF OUTPUT SERVICES GROUP, INC. AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

OSG Group Holdings, Inc., OSG Intermediate Holdings, Inc., OSG Holdings, Inc., Output Services Group, Inc., Globalex Corporation, SouthData, Inc., DoublePositive Marketing Group, Inc., National Business Systems, Inc., NCP Solutions, LLC, The Garfield Group, Inc., Mansell Group Holding Company, Diamond Marketing Solutions Group, Inc., Applied Information Group, Inc., Microdynamics Corporation, Mansell Group, Inc, National Data Services of Chicago, Inc., Microdynamics Group Nebraska, Inc., Microdynamics Transactional Mail, LLC, JJT Enterprises, Inc. (dba Optimal Outsource), and Words, Data and Images, LLC (dba Gabriel Group) (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged plan of reorganization (this "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I hereof.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of this Plan. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III hereof shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. This Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the accompanying Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

Section 1.1    *Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in this Plan:

1.     "***Administrative Claims***" means any and all requests for payment of costs or expenses (other than DIP Claims) of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority under section 507 of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the

Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) Bankruptcy Fees.

2.       "*Administrative Claims Bar Date*" means the first Business Day that is the thirtieth (30th) day after the Effective Date.

3.       "*Affiliate*" means an affiliate as defined in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

4.       "*Allowed*" means a Claim or Interest (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan for such Claim or Interest; (ii) as to which any objection has been settled, waived, withdrawn, or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors or (c) pursuant to the terms of this Plan; *provided*, *however*, that, notwithstanding anything herein to the contrary, by treating a Claim or Interest as Allowed under (i) above (the expiration of the Claims Objection Deadline for such Claim or other applicable deadline for such Claim or Interest), the Debtors do not waive their rights to contest the amount and validity of any (i) disputed Claim or Interest, or (ii) contingent or unliquidated Claim in the time, manner, and venue in which such Claim or Interest would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.  A Claim or Interest that is Allowed shall include a Claim or Interest that is Disputed to the extent such Claim or Interest becomes Allowed after the Effective Date.  A Claim that is Allowed shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law.  Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, a Claim that is Allowed shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from or after the Petition Date.

5.       "*Amended and Restated First Lien Credit Agreement*" means that certain amended and restated credit agreement by and among Reorganized Output Services Group, the other guarantors from time to time party thereto (including, for the avoidance of doubt, Globalex, certain of the Vox Entities, and the Non-Debtor Obligors), the Amended and Restated First Lien Lenders, the New First Lien Agents, and the other Entities party thereto from time, which Amended and Restated First Lien Credit Agreement (i) amends and restates the Existing First Lien Credit Agreement in its entirety, (ii) a substantially completed draft thereof shall be included in the Plan Supplement and (iii) shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

6.       "*Amended and Restated First Lien Documents*" means the Amended and Restated First Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

7.      "***Amended and Restated First Lien Facility***" means, collectively, the amended and restated first lien term loan facility and revolving loan financing facility reflecting the terms and conditions set forth in the new first lien facility term sheet annexed as <u>Exhibit I</u> to the Restructuring Support Agreement and the Amended and Restated First Lien Documents.

8.      "***Amended and Restated First Lien Lenders***" means the lenders party to the Amended and Restated First Lien Documents.

9.      "***Amended and Restated First Lien Loans***" means, collectively, the Amended and Restated Term A Loans, the Amended and Restated Term B Loans, the Amended and Restated Term GBP Loans and the Amended and Restated Revolving Loans.

10.     "***Amended and Restated Revolving Loans***" means the Existing First Lien Revolving Credit Loans after giving effect to the modifications to such loans set forth in the Amended and Restated First Lien Documents (which loans will be deemed funded in an amount equal to the amount of the Existing Revolving Credit Loans as of the Effective Date, which Existing Revolving Credit Loans shall be cancelled as of the Effective Date), and shall include the newly issued "Revolving Commitments" as that term is used in the Amended and Restated First Lien Credit Agreement).

11.     "***Amended and Restated Term A Loans***" means the Existing First Lien Term B Loans after giving effect to the modifications to such loans set forth in the Amended and Restated First Lien Documents.

12.     "***Amended and Restated Term B Loans***" means the Existing First Lien Dollar 2019-A Incremental Term Loans after giving effect to the modifications to such loans set forth in the Amended and Restated First Lien Documents.

13.     "***Amended and Restated Term GBP Loans***" means the Existing First Lien GBP 2019-A Incremental Term Loans after giving effect to the modifications to such loans set forth in the Amended and Restated First Lien Documents.

14.     "***Ballot***" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

15.     "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended.

16.     "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Cases.

17.     "***Bankruptcy Fees***" means any and all fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

18.    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms, or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

19.    "***Business Day***" means any day, other than a Saturday, Sunday, or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

20.    "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

21.    "***Causes of Action***" means any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including but not limited to:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

22.    "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

23.    "***Claim***" means a claim as defined in section 101(5) of the Bankruptcy Code.

24.    "***Claims Objection Deadline***" means the latest of the following dates:  (i) the Effective Date, (ii) as to a particular Claim, the date that is one hundred and eighty (180) days after the date of the filing of a Proof of Claim, if any is filed, or request for payment of such Claim, and (iii) such other date as may be established by the Bankruptcy Court; *provided*, that if any such latest date is not a Business Day, then the Claims Objection Deadline shall be the first Business Day immediately following such latest date.

25.    "***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent.

26.    "***Class***" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

27.    "***Company***" means OSG Group Holdings, Inc. and all of its direct and indirect subsidiaries.

4

28.    "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

29.    "*Confirmation Date*" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

30.    "*Combined Hearing*" means the hearing to be held by the Bankruptcy Court to consider the adequacy of the Disclosure Statement and confirmation of this Plan under sections 1125 and 1129 of the Bankruptcy Code, respectively.

31.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

32.    "*Consenting First Lien Lenders*" means those certain Holders of Existing First Lien Claims party to the Restructuring Support Agreement.

33.    "*Consenting Second Lien Lenders*" means those certain Holders of Existing Second Lien Claims party to the Restructuring Support Agreement.

34.    "*Consenting Stakeholders*" means, collectively, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and the Sponsor.

35.    "*Consummation*" means the occurrence of the Effective Date.

36.    "*Contingent Value Rights Pool*" means the non-voting economic right of each Holder of Existing Holdings Preferred Interests and Existing Holdings Common Interests to receive its pro rata share of up to 5% of the distributions to be made to the holders of Reorganized Common Equity in excess of the greater of (a) the midpoint valuation of the Debtors' business as a going concern as determined by the Debtors' investment banker in connection with this Plan and the Disclosure Statement, and (b) the valuation of the Reorganized Common Equity implied by the Restructuring Transactions, which is $233,188,383 (post-conversion of the New Convertible Preferred Equity), *plus* any and all accrued interest and fees on DIP Claims through the Effective Date.

37.    "*Cure Cost*" means any amount required to cure any monetary default under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by parties to an Executory Contract or Unexpired Lease) that is assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

38.    "*CVR Agreement*" means that certain Contingent Value Rights Agreement to be agreed among the Plan Support Parties in their sole discretion and reasonably acceptable to the Sponsor, by and among Reorganized Holdings and the representative thereunder, and which shall be included in the Plan Supplement, and shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

39.     "***CVR Certificates***" means certificates which will entitle each Holder thereof to its right to its Pro-Rata Share of the Contingent Value Rights Pool as such rights come due on the terms set forth in the CVR Agreement.

40.     "***D&O Liability Insurance Policies***" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

41.     "***Debtor***" has the meaning set forth in the introductory paragraph of this Plan.

42.     "***Debtor Globalex Interest***" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, or other instrument evidencing Output Services Group's ownership interest in Globalex, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto.

43.     "***DIP Agent***" means Wilmington Trust, National Association, as administrative and collateral agent for the DIP Lenders under the DIP Facility Documents, or any successor agents thereunder.

44.     "***DIP Claims***" means any and all Claims against any Debtor (other than Globalex) related to, arising out of, arising under, or arising in connection with the DIP Facility Documents.

45.     "***DIP Commitment***" means the commitment by a Consenting Second Lien Lender to provide a percentage of the DIP Facility.

46.     "***DIP Credit Agreement***" means that certain credit agreement evidencing the DIP Facility by and among Output Services Group, as borrower, the other Debtors party thereto (other than Globalex), as guarantors, the DIP Agent, and the DIP Lenders, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

47.     "***DIP Facility***" means the junior priority debtor in possession secured term loan financing facility consisting of (i) 15,000,000 of New Money DIP Term Loans and (ii) $10,000,000 of Rolled-Up DIP Term Loans plus accrued and unpaid interest and capitalized fees outstanding under the Existing Second Lien Credit Facility on account of such Rolled-Up DIP Term Loans (such amount, the "***Rolled-Up Fees and Interest***"), in each case calculated as of the effective date of the DIP Facility, which Rolled-Up Fees and Interest shall be capitalized and added to the outstanding principal amount of Rolled-Up DIP Term Loans under the DIP Facility, but, for the avoidance of doubt, the Rolled-Up Fees and Interest shall not decrease any New Mezzanine Debt Facility or New Convertible Preferred Equity commitments, in each case on the terms set forth in the DIP Facility Documents.

48.     "*DIP Facility Documents*" means the DIP Credit Agreement and the DIP Orders, together with all documentation executed or delivered in connection therewith as may be amended, modified, or supplemented from time to time, in accordance with the terms and conditions set forth therein, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

49.     "*DIP Lenders*" means the Consenting Second Lien Lenders party to the DIP Credit Agreement.

50.     "*DIP Loans*" means the New Money DIP Term Loans and the Rolled-Up DIP Term Loans (including the Rolled-Up Fees and Interest) issued under the DIP Facility pursuant to the DIP Facility Documents.

51.     "*DIP Orders*" means the Interim DIP Order and Final DIP Order, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

52.     "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as it may be amended from time be time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

53.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

54.     "*Disputed*" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that has not been Allowed.

55.     "*Distribution Date*" means the date on which Holders of Claims or Interests are eligible to receive distributions under this Plan, which date shall be the Effective Date or such other date agreed to by the Debtors and the Plan Sponsor Parties; *provided* that with respect to the Existing First Lien Claims, the distribution date shall be the Effective Date or such other date agreed to by the Debtors and the Required Consenting First Lien Lenders; *provided*, *further*, that the distribution date (and any related record date) with respect to distributions made to Holders of Existing Holdings Preferred Interests and Existing Holdings Common Interests shall be as set forth in the Opt-In Form and related documentation.

56.     "*Effective Date*" means the date that is the first Business Day on which (a) all conditions to the effectiveness of this Plan set forth in Section 8.1 hereof have been satisfied or waived in accordance with the terms of this Plan and (b) no stay of the Confirmation Order is in effect.

57.     "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

58.    "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

59.    "*Evercore*" means Evercore Group L.L.C. as financial advisor and investment banker to Ropes.

60.    "*Exculpated Parties*" means, collectively, in each case, to the fullest extent permitted by law, in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), such Entity's Related Parties.

61.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

62.    "*Existing First Lien Agent*" means Barclays Bank PLC, the administrative and collateral agent for the Existing First Lien Lenders under the Existing First Lien Documents, or any successor administrative agents thereunder.

63.    "*Existing First Lien Claims*" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Documents, including, but not limited to, the Existing First Lien Term Loan Claims and the Existing First Lien Revolving Claims.

64.    "*Existing First Lien Credit Agreement*" means that certain First Lien Credit Agreement, dated as of March 27, 2018 (as may be amended, restated, amended and restated, modified, or supplemented from time to time prior to the Petition Date), by and among OSG Holdings, Inc. as holdings, Output Services Group, as borrower, the guarantors party thereto, the Existing First Lien Lenders, the Existing First Lien Agent, Capital One, N.A., as syndication agent, and any other Entities party thereto from time to time.

65.    "*Existing First Lien Documents*" means the Existing First Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

66.    "*Existing First Lien Dollar 2019-A Incremental Term Loan Claims*" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with the Existing First Lien Dollar 2019-A Incremental Term Loans under the Existing First Lien Documents.

67.    "*Existing First Lien Dollar 2019-A Incremental Term Loans*" has the meaning given to the term "Dollar 2019-A Incremental Term Loans" in the Existing First Lien Credit Agreement.

68.     "***Existing First Lien Facility***" means, collectively, the first lien term loan facility and revolving loan financing facility reflecting the terms and conditions set forth in the Existing First Lien Documents.

69.     "***Existing First Lien GBP 2019-A Incremental Term Loan Claims***" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with the Existing First Lien GBP 2019-A Incremental Term Loans under the Existing First Lien Documents.

70.     "***Existing First Lien GBP 2019-A Incremental Term Loans***" has the meaning given to the term "GBP 2019-A Incremental Term Loans" in the Existing First Lien Credit Agreement.

71.     "***Existing First Lien Lenders***" means the Holders of Existing First Lien Claims.

72.     "***Existing First Lien Loans***" means the loans issued under the Existing First Lien Facility pursuant to the Existing First Lien Documents.

73.     "***Existing First Lien Non-Debtor Obligor Guaranties***" means any guarantee of the Existing First Lien Facility provided by a Non-Debtor Obligor.

74.     "***Existing First Lien Non-Debtor Obligor Liens***" means any Lien granted by a Non-Debtor Obligor to secure any obligation under the Existing First Lien Facility.

75.     "***Existing First Lien Revolving Claims***" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Revolving Credit Commitments or the Existing First Lien Revolving Credit Loans.

76.     "***Existing First Lien Revolving Credit Commitments***" has the meaning given to the term "Revolving Credit Commitments" in the Existing First Lien Credit Agreement.

77.     "***Existing First Lien Revolving Credit Loans***" has the meaning given to the term "Revolving Credit Loans" in the Existing First Lien Credit Agreement.

78.     "***Existing First Lien Term Loan Claims***" means, collectively, the Existing First Lien Term B Loan Claims, the Existing First Lien Dollar 2019-A Incremental Term Loan Claims and the Existing First Lien GBP 2019-A Incremental Term Loan Claims.

79.     "***Existing First Lien Term B Loan Claims***" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Term B Loans under the Existing First Lien Documents.

80.     "***Existing First Lien Term B Loans***" has the meaning given to the term "Term B Loans" in the Existing First Lien Credit Agreement.

81.     "***Existing Holdings Common Interests***" means any issued, unissued, authorized, or outstanding shares of common stock, common restricted stock, options to purchase common stock, or other instruments evidencing an ownership interest in Holdings, whether or not transferable, together with any equity-based awards or contractual rights or warrants to purchase or acquire such equity interests at any time and all rights arising with respect thereto.

82.     "***Existing Holdings Preferred Interests***" means any issued, unissued, authorized, or outstanding shares of preferred stock, preferred restricted stock, options to purchase preferred stock, or other instruments evidencing a preferred ownership interest in Holdings, whether or not transferable, together with any equity-based awards or contractual rights or warrants to purchase or acquire such preferred equity interests at any time and all rights arising with respect thereto.

83.     "*Existing Intercreditor Agreement*" means the Second Lien Intercreditor Agreement, dated as of September 17, 2019 (as amended, supplemented or otherwise modified from time to time), among Holdings, Output Services Group, the other Grantors (as defined therein) from time to time party thereto, the Representative (as defined therein) for the First Lien Credit Agreement Secured Parties (as defined therein), the Representative (as defined therein) for the Second Lien Credit Agreement Secured Parties (as defined therein), and each additional Second Priority Representative and Senior Representative (each as defined therein) party thereto from time to time.

84.     "***Existing Revolving Credit Loans***" has the meaning given to the term "Revolving Credit Loans" in the Existing First Lien Credit Agreement.

85.     "***Existing Second Lien Agent***" means Wilmington Trust, National Association, as the administrative and collateral agent for the Existing Second Lien Lenders under the Existing Second Lien Documents, or any successor administrative agents thereunder.

86.     "***Existing Second Lien Claims***" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with, the Existing Second Lien Documents, including the Existing Second Lien Incremental Loan Claims.

87.     "***Existing Second Lien Credit Agreement***" means that that certain Second Lien Credit Agreement, dated as of September 13, 2019 (as may be amended, restated, amended and restated, modified, or supplemented from time to time prior to the Petition Date), by and among OSG Holdings, Inc., as holdings, Output Services Group, as borrower, the guarantors party thereto, the Existing Second Lien Lenders, the Existing Second Lien Agent, Barclays Bank PLC as sole lead arranger and bookrunner, and any other Entities party thereto from time to time.

88.     "***Existing Second Lien Documents***" means the Existing Second Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

89.     "***Existing Second Lien Facility***" means the second lien term loan financing facility reflecting the terms and conditions set forth in the Existing Second Lien Documents.

90.    "***Existing Second Lien Incremental Loans***" means those incremental loans issued on May 31, 2022 under the Existing Second Lien Facility pursuant to the Existing Second Lien Documents.

91.    "***Existing Second Lien Incremental Loans Claims***" means any and all Claims against any Debtor or Non-Debtor Obligor related to, arising out of, arising under, or arising in connection with the Existing Second Lien Incremental Loans.

92.    "***Existing Second Lien Lenders***" means the Holders of Existing Second Lien Claims.

93.    "***Existing Second Lien Loans***" means all loans issued under the Existing Second Lien Facility, including the Existing Second Lien Incremental Loans, pursuant to the Existing Second Lien Documents.

94.    "***Existing Second Lien Non-Debtor Obligor Guaranties***" means any guarantee of the Existing Second Lien Facility provided by a Non-Debtor Obligor.

95.    "***Existing Second Lien Non-Debtor Obligor Liens***" means any Lien granted by a Non-Debtor Obligor to secure any obligation under the Existing Second Lien Facility.

96.    "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date.

97.    "***Final DIP Order***" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in section 361 of the Bankruptcy Code) to the Existing First Lien Lenders and the Existing Second Lien Lenders in the Chapter 11 Cases on a final basis, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

98.    "***Final Order***" means, as applicable, an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated, or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

99.    "*First Lien Group*" means the group of Consenting First Lien Lenders represented by Paul Hastings LLP.

100.    "*First Lien Group Advisors*" means, collectively: (i) Paul Hastings LLP, as counsel to the First Lien Group; (ii) one local counsel to the First Lien Group; (iii) PJT Partners LP, as financial advisor to the First Lien Group; and (iv) Ashurst LLP, as United Kingdom counsel to the First Lien Group.

101.    "*FTI*" means FTI Consulting, Inc. as financial advisor to the Company.

102.    "*General Unsecured Claims*" means any and all unsecured Claims, including, for the avoidance of doubt, the Pension Guarantee and the Intermediate Vox Sellers' Notes Guaranties, (other than an Administrative Claim, an Vox Unsecured Promissory Note Claim, an OSG February 8 Unsecured Promissory Note Claim, a Professional Fee Claim, an Intercompany Claim, a Priority Tax Claim, an Other Priority Claim, or any Claim subject to subordination under section 510(b) of the Bankruptcy Code) against one or more of the Debtors, including (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party and (b) Claims arising from any litigation or other court, administrative, or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

103.    "*Globalex*" means Globalex Corporation, a California corporation.

104.    "*Globalex Interests*" means, together, the Debtor Globalex Interest and the Sponsor Globalex Interest.

105.    "*Globalex Secured Note*" means that certain Senior Secured Promissory Note, dated as of February 23, 2022, by and among Globalex as borrower and the Sponsor Lender as lender (as may be amended, restated, amended and restated, modified, or supplemented from time to time).

106.    "*Globalex Secured Note Claims*" means any and all Claims against Globalex related to, arising out of, arising under, or arising in connection with the Globalex Secured Note Loan arising under the Globalex Secured Note.

107.    "*Globalex Secured Note Loan*" means the loan made pursuant to the Globalex Secured Note.

108.    "*Globalex Transaction*" means that certain transaction involving Globalex and the Sponsor as further described in the Disclosure Statement.

109.    "*GoldPoint*" means, collectively, GoldPoint Mezzanine Partners IV, LP and GoldPoint Private Credit Fund, LP.

110.    "***GoldPoint Advisors***" means, collectively:  (i) Akin Gump Strauss Hauer & Feld LLP, as counsel to GoldPoint; (ii) one local counsel to GoldPoint; and (iii) Carl Marks & Co., as financial advisor to GoldPoint.

111.    "***Governmental Unit***" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

112.    "***Holder***" means the beneficial holder of any Claim or Interest.

113.    "***Holdings***" means OSG Group Holdings, Inc., a Delaware corporation.

114.    "***Impaired***" means, with respect to a Claim or Interest, such Claim or Interest that falls within a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

115.    "***Indemnification Obligation***" means a Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, bylaws and similar corporate documents, as in effect as of the Petition Date.

116.    "***Indemnified Parties***" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

117.    "***Insurance Policies***" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time that provide coverage, benefits, or proceeds to any of the Debtors (or their predecessors) and all agreements, documents, or instruments relating thereto.

118.    "***Intercompany Claims***" means any and all Claims held by (a) any Debtor against any other Debtor or (b) any direct or indirect subsidiary of a Debtor against a Debtor, including, for the avoidance of doubt, the Intermediate Unsecured Intercompany Note Claim and the Output Services Group Unsecured Intercompany Note Claim.

119.    "***Intercompany Interests***" means any and all Interests in a Debtor or subsidiary of a Debtor that are owned or held by another Debtor, including the Debtor Globalex Interest.

120.    "***Interests***" means any and all issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership, limited liability company interests (whether certificated or uncertificated), or partnership interests, or other instrument evidencing an

ownership interest in any Debtor whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto, including the Existing Holdings Preferred Interests, the Existing Holdings Common Interests, and the Globalex Interests.

121.    "*Interim DIP Order*" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in section 361 of the Bankruptcy Code) to the Existing First Lien Lenders and the Existing Second Lien Lenders in the Chapter 11 Cases on an interim basis, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

122.    "*Intermediate*" means OSG Intermediate Holdings, Inc., a Delaware corporation.

123.    "*Intermediate Unsecured Intercompany Note*" means the unsecured intercompany note, dated as of February 8, 2022, issued by Intermediate to Holdings for $5 million.

124.    "*Intermediate Unsecured Intercompany Note Claims*" means any and all Claims against Intermediate related to, arising out of, arising under, or arising in connection with the Intermediate Unsecured Intercompany Note Loan arising under the Intermediate Unsecured Intercompany Note.

125.    "*Intermediate Unsecured Intercompany Note Loan*" means the loan made pursuant to the Intermediate Unsecured Intercompany Note.

126.    "*Intermediate Vox Sellers' Notes Guaranties*" means the guaranties of the Vox Sellers' Notes provided by Intermediate.

127.    "*Law*" means any federal, state, local, or foreign "law" (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

128.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

129.    "*Management Incentive Plan*" means a management incentive plan, in form and substance acceptable to the Plan Sponsor Parties, of Reorganized Holdings to be implemented on the Effective Date or as soon as reasonably practicable thereafter, which management incentive plan shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

130.    "*New Convertible Preferred Equity*" means that convertible preferred equity to be issued by Reorganized Holdings on the Effective Date as reflected in the terms and conditions set forth in the New Organizational Documents.

131.   "*New First Lien Agents*" means the administrative and collateral agent and the syndication agent under the Amended and Restated First Lien Documents, or any successor administrative agents thereunder.

132.   "*New Mezzanine Debt Agent*" means the administrative agent for the New Mezzanine Debt Lenders under the New Mezzanine Debt Documents, or any successor administrative agents thereunder.

133.   "*New Mezzanine Debt Credit Agreement*" means that certain credit agreement for the New Mezzanine Debt Loans to be entered into on the Effective Date by and among Reorganized Intermediate, the New Mezzanine Debt Lenders, the New Mezzanine Debt Agent, and which credit agreement shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

134.   "*New Mezzanine Debt Documents*" means the New Mezzanine Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

135.   "*New Mezzanine Debt Facility*" means the new unsecured subordinated mezzanine debt financing facility reflecting the terms and conditions set forth in the new mezzanine debt facility term sheet annexed as <u>Exhibit J</u> to the Restructuring Support Agreement and the New Mezzanine Debt Documents.

136.   "*New Mezzanine Debt Lenders*" means the lenders party to the New Mezzanine Debt Documents.

137.   "*New Mezzanine Debt Loans*" means the loans issued under the New Mezzanine Debt Facility pursuant to the New Mezzanine Debt Documents.

138.   "*New Money DIP Term Loans*" has the meaning ascribed to the term "New Money DIP Term Loans" in the DIP Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement.

139.   "*New Organizational Documents*" means, on or after the Effective Date, the organizational and governance documents for Reorganized Holdings and each of the Reorganized Debtors, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, consistent with the terms and conditions set forth in the Restructuring Support Agreement, including the governance term sheet and the new convertible preferred equity term sheet, each annexed as <u>Exhibits E and K</u>, respectively, to the Restructuring Support Agreement, and otherwise in form and substance as set forth in the Restructuring Support Agreement.

140.    "***New Vox Guaranties***" means the unsecured guaranties of the indebtedness and other obligations under the Amended and Restated First Lien Documents being provided by certain of the Vox Entities to the holders of indebtedness and other obligations under the Amended and Restated First Lien Documents, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

141.    "***Non-Debtor Obligors***" means OSG Bidco Limited, Communisis Limited, Communisis UK Limited, Communisis Digital Limited, Communisis International Limited, Communisis Europe Limited, PS Holdings Limited, Communisis PS Limited, Life Marketing Consultancy Limited, Communisis Data Intelligence Limited, PSONA Limited, and PSONA 12 Limited.

142.    "***Notice and Claims Agent***" means Stretto, Inc. in its capacity as noticing, claims, and solicitation agent for the Debtors.

143.    "***Opt-In Form***" means the form by which Holders of Interests in Classes 8 and 9 may voluntarily consent to becoming a Releasing Party by checking the applicable box on such form.

144.    "***OSG February 8 Unsecured Promissory Note***" means that certain Unsecured Promissory Note, dated as of February 8, 2022, by and among Holdings as borrower and the Sponsor Lender as lender (as may be amended, restated, amended and restated, modified, or supplemented from time to time).

145.    "***OSG February 8 Unsecured Promissory Note Claims***" means any and all Claims against Holdings related to, arising out of, arising under, or arising in connection with the OSG February 8 Unsecured Promissory Note Loan arising under the OSG February 8 Unsecured Promissory Note.

146.    "***OSG February 8 Unsecured Promissory Note Loan***" means the loan made pursuant to the OSG February 8 Unsecured Promissory Note.

147.    "***Other Priority Claims***" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

148.    "***Other Secured Claims***" means any and all Secured Claims against any Debtor that are not DIP Claims, Existing First Lien Claims, Existing Second Lien Claims, or Globalex Secured Note Claims.

149.    "***Output Services Group***" means Output Services Group, Inc. a New Jersey corporation.

150.    "***Output Services Group Unsecured Intercompany Note***" means the unsecured intercompany note, dated as of February 8, 2022, issued by Output Services Group to Intermediate for $5 million.

151.    "***Output Services Group Unsecured Intercompany Note Claims***" means any and all Claims against Output Services Group related to, arising out of, arising under, or arising in connection with the Output Services Group Unsecured Intercompany Note Loan arising under the Output Services Group Unsecured Intercompany Note.

152.    "***Output Services Group Unsecured Intercompany Note Loan***" means the loan made pursuant to the Output Services  Group Unsecured Intercompany Note.

153.    "***Outside Date***" means August 31, 2022.

154.    "***Pemberton***" means, collectively, Pemberton Strategic Credit Holdings Sarl, Pemberton Managed Account A Holdings Sarl, Pemberton Managed Account B Holdings Sarl, PEMBERTON MID-MARKET DEBT HOLDINGS III (USD CO-INVESTMENT), a compartment of Pemberton Mid-Market Debt III Master Holdco SV S.à.r.l., PEMBERTON STRATEGIC CREDIT HOLDINGS II (A), a compartment of Pemberton Strategic Credit II Master Holdco SV S.à.r.l., Pemberton Strategic Credit Holdings II (B), a compartment of Pemberton Strategic Credit II Master Holdco SV S.à.r.l.

155.    "***Pemberton Advisors***" means, collectively: (i) Latham & Watkins LLP, as counsel to Pemberton; (ii) Young Conaway Stargatt & Taylor, LLP, as local counsel to Pemberton; (iii) Houlihan Lokey, Inc., as financial advisor to Latham & Watkins LLP; and (iv) PricewaterhouseCoopers LLP, as tax advisor and as United Kingdom pension advisor to Pemberton.

156.    "***Pension Guarantee***" means the Deed of Guarantee dated 17 September 2019 between Output Services Group and the Trustee.

157.    "***Pension Regulator***" means the body corporate established under section 1 of the UK Pensions Act 2004 (or any successor or replacement body from time to time).

158.    "***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

159.    "***Petition Date***" means the date on which the Debtors each filed a petition for relief commencing the Chapter 11 Cases.

160.    "***Plan***" means this joint prepackaged plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, including all exhibits and schedules to this Plan, and any Plan Supplement, as they may be amended, supplemented or modified from time to time in accordance with the terms hereof, the terms of the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules.

161.    "***Plan Sponsor Parties***" means all of the Existing Second Lien Lenders who have also made DIP Commitments as set forth in the Restructuring Support Agreement.

162.    "***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, as the same may be amended, modified, or supplemented, and including, without limitation, the following:  (a) the identity of the known members of the Reorganized Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (b) the New Organizational Documents; (c) the Amended and Restated First Lien Credit Agreement; (d) the New Mezzanine Credit Agreement; (e) the Management Incentive Plan; (f) the CVR Agreement and the CVR Certificates; (g) the Restructuring Transactions Memorandum; (h) the Vox Contribution Documents; (i) the Schedule of Retained Causes of Action; (j) Schedule of Assumed Executory Contracts and Unexpired Leases; (k) Schedule of Rejected Executory Contracts and Unexpired Leases; (l) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing; and (m) any additional documents filed with the Bankruptcy Court before the Effective Date as additional documents or amendments to the Plan Supplement.

163.    "***Prepetition Secured Credit Agreements***" means, together, the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement.

164.    "***Priority Tax Claims***" means any and all Claims against any Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

165.    "***Professional Fee Claims***" means any and all Claims of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on or as of the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; *provided* that the amount of Allowed Professional Fee Claims for Ropes, Evercore, and FTI for the period of January 1, 2022 through the Outside Date shall not, in the aggregate, exceed the amount set forth in the budget to the Restructuring Support Agreement.

166.    "***Professional Fee Escrow Account***" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount to be funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

167.    "***Professional Fee Reserve Amount***" means the aggregate accrued and unpaid Professional Fee Claims through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of this Plan; *provided* that such amount shall not, in the aggregate, exceed the amount set forth in the budget to the Restructuring Support Agreement.

168.    "***Professionals***" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

169.    "**_Proof of Claim_**" means a "proof of claim," as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs, or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Debtors' Chapter 11 Cases.

170.    "**_Pro-Rata Share_**" means with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

171.    "**_Reinstated_**" or "**_Reinstatement_**" mean, with respect to Claims and Interests, the treatment provided for in section 1124 of the DIP Bankruptcy Code.

172.    "**_Related Parties_**" means to the fullest extent permitted by law, with respect to any Entity, such Entity's predecessors, successors, assigns, and affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders (regardless of whether such equity interests are held directly or indirectly), officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, direct and indirect parent Entities, "controlling persons" (within the meaning of the federal securities law), heirs, administrators and executors, and other professionals, in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable. For the avoidance of any doubt, with respect to the Sponsor, Aquiline Capital Partners III GP (Offshore) LTD, Aquiline Capital Partners LLC, and Aquiline Capital Partners Limited are Related Parties.

173.    "**_Released Parties_**" means, collectively, (a) each of the Consenting Stakeholders (including without limitation, each of the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and the Sponsor), (b) the Company, (c) each Holder of Existing Holdings Preferred Interests who voluntarily and timely executes and returns to the Debtors the Opt-In Form, (d) each Holder of Existing Holdings Common Interests who voluntarily and timely executes and returns to the Debtors the Opt-In Form, (e) the DIP Lenders, (f) the agents under each of the DIP Credit Agreement and the Prepetition Secured Credit Agreements, (g) the New First Lien Agents, (h) the Amended and Restated First Lien Lenders, (i) the New Mezzanine Debt Agent, (j) the New Mezzanine Debt Lenders, (k) each Holder of Reorganized Common Equity, (l) each Holder of New Convertible Preferred Equity, and (m) the Related Parties of each of the foregoing entities in clauses (a) through (l) of this definition to the fullest extent permitted by law.

174.    "**_Releases_**" means the releases given by the Releasing Parties to the Released Parties under Article IX hereof.

175.    "**_Releasing Parties_**" means, collectively, (a) each of the Consenting Stakeholders (including without limitation, each of the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and the Sponsor), (b) the Company, (c) each Holder of Existing Holdings Preferred Interests who voluntarily and timely executes and returns to the Debtors the Opt-In Form, (d) each Holder of Existing Holdings Common Interests who voluntarily and timely executes and returns

to the Debtors the Opt-In Form, (e) the DIP Lenders, (f) the agents under each of the DIP Credit Agreement and the Prepetition Secured Credit Agreements, (g) the New First Lien Agents, (h) the Amended and Restated First Lien Lenders, (i) the New Mezzanine Debt Agent, (j) the New Mezzanine Debt Lenders, (k) each Holder of Reorganized Common Equity, (l) each Holder of New Convertible Preferred Equity, and (m) the Related Parties of each of the foregoing Entities in clauses (a) through (l) of this definition to the fullest extent permitted by law.  For the avoidance of doubt, each of the Releasing Parties hereby grants the Release in all of its capacities, in accordance with the terms and conditions set forth in this Plan.

176.    "***Reorganized Board***" means the board of managers of Reorganized Holdings, as determined in accordance with the New Organizational Documents.

177.    "***Reorganized Common Equity***" means the units of common equity of Reorganized Holdings authorized under the New Organizational Documents and issued pursuant to this Plan.

178.    "***Reorganized Debtors***" means collectively, each of the Debtors and any successors thereto, by consolidation, or otherwise, including, without limitation, Reorganized Holdings, Reorganized Intermediate, and Reorganized Output Services Group, as reorganized on or after the Effective Date, in accordance with this Plan.

179.    "***Reorganized Holdings***" means Holdings on the Effective Date, which Entity shall have been converted to a Delaware limited liability company on or about the Effective Date, and which shall be treated as a corporation for U.S. federal income tax purposes.  For the avoidance of doubt, Reorganized Holdings shall either directly or indirectly own 100% of the Interests in the Entity that owns 100% of the Interests in Reorganized Output Services Group.

180.    "***Reorganized Intermediate***" means Intermediate on the Effective Date.

181.    "***Reorganized Output Services Group***" means Output Services Group on the Effective Date.

182.    "***Required Consenting First Lien Lenders***" means as of any date of determination, Consenting First Lien Lenders who are part of the First Lien Group and own or control as of such date at least 66-2/3% of aggregate principal amount of all outstanding Existing First Lien Loans owned or controlled by all Consenting First Lien Lenders who are part of the First Lien Group.

183.    "***Required Consenting Stakeholders***" means, together, the Required Consenting First Lien Lenders and the Consenting Second Lien Lenders.

184.    "***Restructuring Expenses***" means the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses incurred by each of the following advisors:  (i) the First Lien Group Advisors; (ii) the Pemberton Advisors; (iii) the GoldPoint Advisors; and (iv) other professional advisors to the DIP Lenders (in each case payable in accordance with the applicable fee reimbursement letters entered into by the Company and such professionals and to the extent not otherwise paid pursuant to the DIP Orders or DIP Facility Documents); in each case, subject to the terms set forth in section 7.04(b) of the Restructuring Support Agreement and

without further order of, or application to, the Bankruptcy Court by such consultant or professionals, including, the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed as an Administrative Claim upon occurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

185.    "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of May 31, 2022, by and among the Debtors and the Consenting Stakeholders, and any person or Entity that subsequently becomes a party thereto, including any exhibits thereto, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

186.    "*Restructuring Transactions*" means the transactions necessary to complete this Plan, as further described in Article IV, Section 4.3 hereof.

187.    "*Restructuring Transactions Memorandum*" means that certain document included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

188.    "*Retained Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

189.    "*Rolled-Up DIP Term Loans*" has the meaning ascribed to the term "Rolled-Up Term Loans" in the DIP Term Sheet attached as Exhibit D to the Restructuring Support Agreement.

190.    "*Ropes*" means Ropes & Gray LLP, as legal counsel to the Company.

191.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan.

192.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan.

193.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

194.    "*Secured Claims*" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of

setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

195.    "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

196.    "*Security*" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

197.    "*Solicitation Materials*" means (i) the Ballot and applicable voting instructions, (ii) the Disclosure Statement and all exhibits thereto, including this Plan, and (iii) any other documents necessary to effect or approve the solicitation of votes with respect to the Restructuring Transactions to be consummated pursuant to this Plan, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

198.    "*Sponsor*" means, together, the Sponsor Lender and the Sponsor Equityholder.

199.    "*Sponsor Contributions*" means the Sponsor's provision of the following on the Effective Date:  (a) the entirety of the Sponsor Globalex Interest and (b) the exchange or forgiveness of (whichever is most efficient for tax purposes) all amounts outstanding and obligations owed to the Sponsor Lender pursuant to the Globalex Secured Note, the Vox Unsecured Promissory Note, and the OSG February 8 Unsecured Promissory Note.

200.    "*Sponsor Equityholder*" means Aquiline Financial Services Fund III, L.P. in its capacities as Holder of Existing Holdings Preferred Interests, Holder of Existing Holdings Common Interests, and Holder of Sponsor Globalex Interest.

201.    "*Sponsor Globalex Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, or other instrument evidencing the Sponsor's ownership interest in Globalex, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto.

202.    "*Sponsor Lender*" means Aquiline Financial Services Fund III, L.P. in its capacities as Holder of 100% of the aggregate amount of all outstanding Globalex Secured Note Claims, Holder of 100% of the aggregate amount of all outstanding Vox Unsecured Promissory Note Claims, and Holder of 100% of the aggregate amount of all outstanding OSG February 8 Unsecured Promissory Note Claims.

203.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes, and other similar taxes imposed or assessed by any Governmental Unit.

204.   "*Subordinated Claims*" means any Claims that are subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor for damages arising from the purchase or sale of such a Security or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.

205.   "*Trustee*" means Communisis Trustee (2011) Company Limited in its capacity as sole trustee of the UK DB Plan, together with any additional or replacement trustee(s) of the UK DB Plan from time to time.

206.   "*UK DB Plan*" means the Communisis UK DB Plan, currently governed by a Definitive Deed and Rules dated 15 May 2007 (as amended from time to time).

207.   "*UK Pension Approvals and Ratification*" means the confirmations given by the Company or received by the Company and the Consenting Stakeholders, in form and substance satisfactory to the Company and the Plan Sponsor Parties, after consultation with the Required Consenting First Lien Lenders and the Sponsor, (A) relating to the UK DB Plan, including that (i) the Trustee has been notified of the key terms of the Restructuring Transactions relevant to the UK DB Plan's employer covenant; (ii) the Trustee has confirmed in writing that it either (a) considers the Restructuring Transactions will not be materially detrimental to the covenant supporting the UK DB Plan or (b) it does not object to the Restructuring Transactions proceeding, (iii) the Trustee has not notified the Company of its intention to carry out an actuarial valuation (within the meaning of s.224(2)(a) of the UK Pensions Act 2004) for the UK DB Plan with an effective date of earlier than March 31, 2023, not requested or demanded any employer contributions in addition to those set out in the recovery plan and schedule of contributions dated July 27, 2021 to, or other financial support for, the UK DB Plan (except for any amended and restated version of the Pension Guarantee that may be agreed pursuant to the restructuring term sheet annexed as Exhibit C to the Restructuring Support Agreement) and not triggered or threatened to trigger the winding-up of the UK DB Plan (in whole or in part) and (iv) the Pension Regulator shall not have raised any material concerns in relation to the Restructuring Transactions, issued, or indicated that it will issue, a warning notice in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan for the purposes of the UK Pensions Act 2004, issued a contribution notice or financial support direction in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan for the purposes of the UK Pensions Act 2004 or exercised or threatened to exercise any power, or impose any penalty, in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan pursuant to section 58A, section 58B, section 58C, or section 58D of the UK Pensions Act 2004; and (B) evidencing that Output Services Group shall have assumed the Pension Guarantee or have agreed with the Trustee an amended and restated version of the Pension Guarantee or other security or financial support in form and substance satisfactory to the Trustee, the Company, and the Plan Sponsor Parties.

208.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

209.    "*Unimpaired*" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

210.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

211.    "*Vox Contribution*" means the transaction set forth in Article IV, Section 4.18 hereof.

212.    "*Vox Contribution Documents*" means, collectively, the agreements, assignments, bills of sale, or other required documents to effectuate the Vox Contribution, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

213.    "*Vox Entities*" means, collectively, PS Newco 1 Limited, Vox Group Limited, Vox Supply Partners Limited, Vox SP Inc., Vox Europe B.V., Vox Supply Group Trading (Suzhou Co. Ltd.), Vox Digital Partners Ltd., Raudo Digital Ltd., and Vox Marketing Ltd.

214.    "*Vox Loan*" means the transaction set forth in Article IV, Section 4.18 hereof.

215.    "*Vox Sellers' Notes*" means those certain notes issued to Brian Leech and John Kerr pursuant to the *Loan Note Instrument Constituting Fixed Rate Secured Guaranteed 8% Loan Notes 2024 and Payment in Kind Notes* dated February 2, 2022 by PS Newco 1 Limited.

216.    "*Vox Unsecured Promissory Note*" means that certain Unsecured Promissory Note, dated as of February 1, 2022, by and among Holdings as borrower and the Sponsor Lender as lender (as may be amended, restated, amended and restated, modified, or supplemented from time to time).

217.    "*Vox Unsecured Promissory Note Claims*" means any and all Claims against Holdings related to, arising out of, arising under, or arising in connection with the Vox Unsecured Promissory Note Loan arising under the Vox Unsecured Promissory Note.

218.    "*Vox Unsecured Promissory Note Loan*" means the loan made pursuant to the Vox Unsecured Promissory Note.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references herein to

"Articles" and "Sections" are references to Articles and Sections, respectively, of this Plan; (v) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (viii) references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (xi) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

(b)     The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)     All references in this Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)     In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control.  In the event of an inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.

(e)     Notwithstanding anything to the contrary in the Plan, any and all consent rights set forth in Section 3.03 of the Restructuring Support Agreement with respect to any matter, including the form and substance of the Plan, all exhibits to the Plan, and the Plan Supplement, and any other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by reference (including to the applicable definitions in Section 1.1 of the Plan) and be fully enforceable as if stated in full in the Plan.  Failure to reference in the Plan the rights referred to in the immediately preceding sentence shall not impair such rights and obligations.  In case of a conflict between the consent rights in the Plan and the consent rights in the Restructuring Support Agreement, the consent rights in the Restructuring Support Agreement shall govern.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article II hereof.

Section 2.1    *Administrative Claims.*

(a)    Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to less favorable treatment, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(b)    All requests for payment of an Administrative Claim (other than DIP Claims, Restructuring Expenses, or Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims (other than DIP Claims, Restructuring Expenses, or Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Reorganized Debtors, and such Administrative Claims shall be deemed discharged, compromised, settled, and released as of the Effective Date.

(c)    The Reorganized Debtors may settle Administrative Claims (other than DIP Claims) in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim (other than DIP Claims) no later than forty-five (45) days after the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

Section 2.2    *Priority Tax Claims.*

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between

the Debtors and the Holder of such Claim, or when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

Section 2.3    *Professional Fee Claims.*

(a)      All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses must be filed no later than the first Business Day that is forty-five (45) days after the Effective Date.   After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      On the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.   Subject to the last sentence of this Section 2.3(b), the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.   Subject to the last sentence of this Section 2.3(b), no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way.   The Reorganized Debtors shall be obligated to pay Allowed Professional Fee Claims in excess of the Professional Fee Escrow Amount.   The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by an Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.   When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

(c)      The Retained Professionals shall reasonably estimate in good faith their accrued Professional Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Consenting Stakeholders no later than three (3) Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.   If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.   The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)      On and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors (as applicable) after the Confirmation Date but prior to the Effective Date in the ordinary course of business and without any further notice to or action, order, or

approval of the Bankruptcy Court except as otherwise specifically provided in this Plan. The Reorganized Debtors shall pay, within ten (10) Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors after the Confirmation Date but prior to the Effective Date; *provided* that such amounts shall not exceed the Professional Fee Reserve Amount and such amounts shall be credited against the applicable caps set forth in the Professional Fee Reserve Amount.   If the Debtors or Reorganized Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  From and after the Confirmation Date but prior to the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that such amounts shall not exceed the Professional Fee Reserve Amount.

Section 2.4    *DIP Claims.*

(a)    The DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses, and all other obligations related to the DIP Facility.

(b)    Notwithstanding anything to the contrary herein, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive New Convertible Preferred Equity issued by Reorganized Holdings on the Effective Date and New Mezzanine Debt Loans issued by Reorganized Intermediate on the Effective Date, the amounts of which are set forth in **Schedule 1** attached hereto.

Section 2.5    *Statutory Fees.*

The Debtors and the Reorganized Debtors, as applicable, shall pay all quarterly fees under 28 U.S.C § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.1    *Classification of Claims.*[2]

(a)    This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  Except for the Claims addressed in Article II hereof (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims, as described in Article II hereof.

(b)    All Claims and Interests required to be classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code are set forth below.  Such classification is for all purposes, including for purposes of voting, Confirmation, and distribution pursuant to this Plan.

(c)    The classification and the treatment of all Claims under this Plan take into consideration (i) the existence of guarantees or alleged guarantees by the Debtors of obligations of other Debtors or Entities; and (ii) that Debtors may be joint obligors with other Debtors or Entities with respect to the same obligation.

Section 3.2    *Class Identification.*

The following chart sets forth the classification of the Claims or Interests for each Debtor, whether that Class of Claims or Interests is Impaired, and the voting rights of the members of such Class.

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---|:---:|:---|
| 1 | Existing First Lien Claims | Impaired | Yes |
| 2 | Existing Second Lien Claims | Impaired | Yes |
| 3 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 4 | Other Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 5 | General Unsecured Claims | Unimpaired | No (conclusively presumed to accept) |
| 6 | Sponsor Contributions | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed not to accept) |

---

[2]    The Debtors reserve the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable Law.

| Class | Claims and Interests | Status | Voting Rights |
|:---:|---|---|---|
| 8 | Existing Holdings Preferred Interests | Impaired | No (deemed not to accept) |
| 9 | Existing Holdings Common Interests | Impaired | No (deemed not to accept) |
| 10 | Intercompany Interests | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed not to accept) |

Section 3.3    *Treatment and Voting Rights of Claims and Interests.*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not due, in accordance with its terms in the ordinary course.

(a)    *Class 1—Existing First Lien Claims.*

(i)    *Classification*: Class 1 consists of Existing First Lien Claims.

(ii)    *Allowed Amount:*  The Existing First Lien Claims shall be Allowed in an amount not less than $625,685,714.1 of principal plus accrued and unpaid interest owed under the Existing First Lien Credit Agreement through the Petition Date.

(iii)    *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to in writing by such Holder of an Allowed Existing First Lien Claim as to less favorable treatment, on the Effective Date, each Holder of an:  (A) Allowed Existing First Lien Term B Loan Claim shall receive and shall be deemed to accept its Pro-Rata Share of the Amended and Restated Term A Loans issued under the Amended and Restated First Lien Credit Agreement; (B) Allowed Existing First Lien Dollar 2019-A Incremental Term Loan Claim shall receive and shall be deemed to accept its Pro-Rata Share of the Amended and Restated Term B Loans; (C) Allowed Existing First Lien GBP 2019-A Incremental Term Loan Claim shall receive and shall be deemed to accept its Pro-Rata Share of the Amended and Restated Term GBP Loans; and (D) Allowed Existing First Lien Revolving Claim shall receive and shall be deemed to accept its Pro-Rata Share of the Amended and Restated Revolving Loans.

30

       (iv)    *Impairment and Voting*:  Class 1 is Impaired under this Plan.  Holders of Allowed Existing First Lien Claims are entitled to vote to accept or reject this Plan.

(b)    *Class 2—Existing Second Lien Claims.*

       (i)    *Classification*: Class 2 consists of all Existing Second Lien Claims.

       (ii)    *Allowed Amount*:  The Existing Second Lien Claims shall be Allowed in an amount not less than $161,429,498.72 of principal plus accrued and unpaid interest owed under the Existing Second Lien Credit Agreement through the Petition Date.

       (iii)    *Treatment:*  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to in writing by such Holder of an Allowed Existing Second Lien Claim as to less favorable treatment, on the Effective Date, each Holder of an Allowed Existing Second Lien Claim shall receive its Pro-Rata Share of (A) New Mezzanine Debt Loans in the amount set forth in **Schedule 1** line BB attached hereto and (B) the Reorganized Common Equity in the amount set forth in **Schedule 1** line EF attached hereto, subject to dilution from the Management Incentive Plan and the conversion of New Convertible Preferred Equity.

       (iv)    *Impairment and Voting*:  Class 2 is Impaired under this Plan.  Holders of Allowed Existing Second Lien Claims are entitled to vote to accept or reject this Plan.

(c)    *Class 3—Other Secured Claims.*

       (i)    *Classification*: Class 3 consists of all Other Secured Claims.

       (ii)    *Treatment:*  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors:  (A) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim; (B) the collateral securing its Allowed Other Secured Claim; (C) Reinstatement of its Allowed Other Secured Claim; or (D) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

       (iii)    *Impairment and Voting*:  Class 3 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject this Plan.

(d)     *Class 4—Other Priority Claims.*

    (i)     *Classification*: Class 4 consists of all Other Priority Claims.

    (ii)     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with Section 1129(a)(9) of the Bankruptcy Code.

    (iii)     *Impairment and Voting*:  Class 4 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject this Plan.

(e)     *Class 5—General Unsecured Claims.*

    (i)     *Classification*: Class 5 consists of all General Unsecured Claims.

    (ii)     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to less favorable treatment, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall (A) receive payment in full in Cash of the unpaid portion of its Allowed General Unsecured Claim paid in the ordinary course of business, (B) be Reinstated, or (C) receive such other less favorable treatment as reasonably agreed to by the Debtors and the Plan Sponsor Parties after consultation with the Required Consenting First Lien Lenders.

    (iii)     *Impairment and Voting*:  Class 5 is Unimpaired under this Plan.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject this Plan.

(f)     *Class 6—Sponsor Contributions.*

    (i)     *Classification*: Class 6 consists of all of the Globalex Secured Note Claims, Vox Unsecured Promissory Note Claims, the OSG February 8 Unsecured Promissory Note Claims, and the Sponsor Globalex Interest.

    (ii)     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of, and except as otherwise agreed to less favorable treatment, on the Effective Date, the Sponsor, as Holder of the Globalex Secured Note Claims, Vox Unsecured Promissory Note Claims, the OSG February 8 Unsecured Promissory Note Claims, and the Sponsor Globalex Interest, shall provide the Sponsor Contributions and shall, in return, receive the

New Convertible Preferred Equity in the amount set forth in **Schedule 1** line EV attached hereto.

(iii) *Impairment and Voting*:  Class 6 is Impaired under this Plan.  The Sponsor, as Holder of the Globalex Secured Note Claims, Vox Unsecured Promissory Note Claims, the OSG February 8 Unsecured Promissory Note Claims, and the Sponsor Globalex Interest, is entitled to vote to accept or reject this Plan.

(g) *Class 7—Intercompany Claims.*

(i) *Classification*:  Class 7 consists of all Intercompany Claims.

(ii) *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim either (A) Reinstated or (B) cancelled, released, and extinguished without any distribution, at the Debtors' election with the consent of the Plan Sponsor Parties.

(iii) *Impairment and Voting*:  Class 7 is either Impaired with no distribution or Unimpaired under this Plan.  In either case, Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

(h) *Class 8—Existing Holdings Preferred Interests.*

(i) *Classification*: Class 8 consists of all Existing Holdings Preferred Interests.

(ii) *Treatment*:  On the Effective Date, all Allowed Existing Holdings Preferred Interests shall be cancelled, released, and extinguished, and Holders of Allowed Existing Holdings Preferred Interests shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing Holdings Preferred Interests.

Notwithstanding the foregoing, on the Effective Date, any Holder of an Allowed Existing Holdings Preferred Interests who agrees to voluntarily grant a release by timely executing and returning to the Debtors the Opt-In Form shall receive its Pro-Rata Share of the Contingent Value Rights Pool, which would come from enterprise value that would otherwise flow to holders of Allowed Existing Second Lien Claims on account of such Allowed Existing Second Lien Claims.  For the avoidance of doubt, only holders of Existing Holdings Preferred Interests and Existing Holdings Common Interests shall receive CVR Certificates, and all holders of Allowed Existing Second Lien Claims shall relinquish all rights to or claim in or any interest in the Contingent Value Rights Pool on account of such Allowed Existing Second Lien Claims.  For the further avoidance of doubt,

33

notwithstanding anything herein to the contrary, the Sponsor shall not be required to submit an Opt-In Form and the Sponsor shall receive its Pro-Rata Share of the Contingent Value Rights Pool on account of its Allowed Existing Holdings Preferred Interests.

(iii)   *Impairment and Voting*:  Class 8 is Impaired under this Plan.  Holders of Allowed Existing Holding Preferred Interests are deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Existing Holdings Preferred Interests will not be entitled to vote to accept or reject this Plan.

(i)   *Class 9—Existing Holdings Common Interests.*

(i)   *Classification*: Class 9 consists of all Existing Holdings Common Interests.

(ii)   *Treatment*:  On the Effective Date, all Allowed Existing Holdings Common Interests shall be cancelled, released, and extinguished, and Holders of Allowed Existing Holdings Common Interests shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing Holdings Common Interests.

Notwithstanding the foregoing, on the Effective Date, any Holder of an Allowed Existing Holdings Common Interests who agrees to voluntarily grant a release by timely executing and returning to the Debtors the Opt-In Form shall receive its Pro-Rata Share of the Contingent Value Rights Pool, which would come from enterprise value that would otherwise flow to holders of Allowed Existing Second Lien Claims on account of such Allowed Existing Second Lien Claims.  For the avoidance of doubt, only holders of Existing Holdings Preferred Interests and Existing Holdings Common Interests shall receive CVR Certificates, and all holders of Allowed Existing Second Lien Claims shall relinquish all rights to or claim in or any interest in the Contingent Value Rights Pool on account of such Allowed Existing Second Lien Claims.  For the further avoidance of doubt, notwithstanding anything herein to the contrary, the Sponsor shall not be required to submit an Opt-In Form and the Sponsor shall receive its Pro-Rata Share of the Contingent Value Rights Pool on account of its Allowed Existing Holdings Common Interests.

(iii)   *Impairment and Voting*:  Class 9 is Impaired under this Plan.  Holders of Allowed Existing Holding Common Interests are deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Existing Holdings Common Interests will not be entitled to vote to accept or reject this Plan.

(j)   *Class 10—Intercompany Interests.*

(i)   *Classification*: Class 10 consists of all Intercompany Interests.

(ii)    *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Interest shall have its Interest (A) Reinstated or (B) cancelled, released, and extinguished and without any distribution at the Debtors' election, with the consent of the Plan Sponsor Parties.

(iii)   *Impairment and Voting*: Class 10 is either Impaired with no distribution or Unimpaired under this Plan. In either case, Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

Section 3.4    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, the DIP Orders, or the DIP Facility Documents, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

Section 3.5    *Voting; Presumptions; Solicitation.*

(a)    *Acceptance by Certain Impaired Classes*. Only Holders of Allowed Claims or Interests in Classes 1, 2, and 6 are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least 66.67% in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan. Holders of Allowed Claims or Interests in Classes 1, 2, and 6 have received Ballots containing detailed voting instructions.

(b)    *Conclusively Presumed Acceptance by Unimpaired Classes*. Holders of Claims in Classes 3, 4, and 5, and certain Holders of Claims in Class 7 and Interests in Class 10 are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)    *Deemed Not To Accept by Certain Impaired Classes*. Holders of Interests in Classes 8 and 9 and certain Holders of Claims in Class 7 and Interests in Class 10 are deemed not to accept this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)    *Disputes Regarding Impairment*. If a Holder of a Claim or Interest disputes the classification of such Holder's Claim or Interest, then upon the filing of an objection to the Plan by such Holder, the Bankruptcy Court shall, after notice and a hearing, determine the proper classification of such Claim or Interest on or before the Confirmation Date.

Section 3.6    *Nonconsensual Confirmation.*

Because certain Classes of Claims or Interests are deemed not to vote to accept this Plan, the Debtors will seek Confirmation of this Plan under section 1129(b) of the Bankruptcy Code.

Section 3.7    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 3.8    *Vacant Classes*.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall not be deemed to have voted on this Plan for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Section 3.9    *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure of the Reorganized Debtors.

Section 3.10    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or Reorganized Debtor's right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1    *Compromise or Settlement of Controversies.*

(a)    Other than as specifically set forth herein, this Plan shall be deemed a motion to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies, including, without limitation, all Claims, Interests, Causes of Action, and controversies arising from or relating to the Globalex Transaction, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of

such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under this Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Section 4.2    *Sources of Consideration for Plan Distribution.*

(a)    The Debtors shall fund distributions under this Plan with:  (1) Cash on hand, including Cash from operations; (2) the proceeds of the DIP Loans; (3) the Amended and Restated First Lien Loans; (4) the proceeds of the New Mezzanine Debt Loans; (5) the proceeds of the New Convertible Preferred Equity; (6) the Sponsor Contributions; (7) the Reorganized Common Equity; (8) the Vox Contribution; and (9) the Contingent Value Rights Pool.  Cash payments to be made pursuant to this Plan will be made by the Reorganized Debtors.  The Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan; *provided* that proceeds of the New Mezzanine Debt Loans and New Convertible Preferred Equity shall be on account of the new-money portion of the New Mezzanine Debt Loans and New Convertible Preferred Equity as set forth in **Schedule 1** attached hereto (which for the avoidance of doubt shall include (i) $1,800,000 of the $1,872,000 of Rolled-Up DIP Term Loans shown at Line BO of **Schedule 1** as converting into New Mezzanine Debt Loans and (ii) $23,200,000 of the $24,128,000 of Rolled-Up DIP Term Loans shown at Line CS of **Schedule 1** as converting into New Convertible Preferred Equity for a total new-money commitment of $70,000,000 of combined New Mezzanine Debt Loans and New Convertible Preferred Equity, inclusive of the amounts in romanettes (i) and (ii), and as reflected at Lines BR through BX and CZ through DF of **Schedule 1**), and shall not include any portion of the New Mezzanine Debt Loans or New Convertible Preferred Equity on account of any amounts of the Existing Second Lien Claims being converted into New Mezzanine Debt Loans on the Effective Date as set forth in **Schedule 1** attached hereto or any amounts of accrued interest and fees on the DIP Claims being converted into New Mezzanine Debt Loans or New Convertible Preferred Equity on the Effective Date as set forth in **Schedule 1** attached hereto.

(b)    From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the Vox Contribution Documents, the CVR Agreement and the CVR Certificates, the amended and restated Pension Guarantee, and the New Organizational Documents), the Reorganized Debtors shall have the right and authority

without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors (or other applicable governing bodies) of the applicable Reorganized Debtors deem appropriate.

Section 4.3    *Restructuring Transactions.*

Following the Confirmation Date and subject to any applicable limitations set forth in any post-Effective Date agreements, the Debtors and the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan (the "Restructuring Transactions"), including: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of conversion, formation or incorporation or consolidation with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the Amended and Restated First Lien Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (f) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors.

On the Effective Date, the Existing First Lien Facility shall be amended and restated into the Amended and Restated First Lien Facility, which, among other things, shall extend the maturity under the Existing First Lien Facility for all Holders of Allowed Existing First Lien Claims, irrespective of whether such Holders vote to accept or reject the Plan, and may provide any waivers, grants of liens or guarantees, necessary to implement the Restructuring Transactions.

Section 4.4    *Continued Corporate Existence.*

Except as otherwise provided in this Plan, or as otherwise may be agreed between the Debtors and the Required Consenting Stakeholders, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time

thereafter; or (f) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

Section 4.5    *Corporate Action.*

(a)    On the Effective Date, all actions contemplated by this Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, including:  (i) the selection of the managers or directors, as applicable, and officers of each of the Reorganized Debtors; (ii) the distribution of the New Convertible Preferred Equity, the Reorganized Common Equity, and the Contingent Value Rights Pool as provided herein or in the Plan Supplement; (iii) the execution and entry into the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the New Organizational Documents, the CVR Agreement and CVR Certificates, and the Vox Contribution Documents; and (iv) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

(b)    On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, securities, certificates of conversion, certificates of formation, certificates of incorporation, operating agreements, and instruments contemplated by this Plan  (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Organizational Documents, the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the CVR Agreement and CVR Certificates, the Vox Contribution Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

(c)    The authorizations and approvals contemplated by this Section 4.5 shall be effective notwithstanding any requirements under non-bankruptcy Law.

Section 4.6    *Vesting of Assets.*

Except as otherwise provided herein, on the Effective Date, all property of the Estates of the Debtors, including all Claims, Interests, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Section 4.7    *Indemnification Provisions in Organizational Documents.*

Any D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) pursuant to which any of the Debtors' current and former directors, officers, managers, or other employees are insured shall remain in force through the expiration of any such Insurance Policy (or "tail policy," as applicable).

On or before the Effective Date, to the extent not already obtained, the Debtors shall obtain a new D&O Liability Insurance Policy and a "tail policy" for the existing D&O Liability Insurance Policy for the benefit of the Debtors' current and former directors, officers, managers, or other employees on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement, and at an expense reasonably acceptable to the Debtors and the Required Consenting Stakeholders.  Alternatively, if the D&O Liability Insurance Policy has not expired, the Debtors shall assume (and assign to the Reorganized Debtors if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and Confirmation Order, the D&O Liability Insurance Policy.

All Indemnification Obligations (and provisions) currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions, management agreements or employment or indemnification contracts, or otherwise) for the current and former directors, officers, employees, attorneys, other professionals, and agents of each of the Debtors and such current and former directors' and officers' respective affiliates shall be assumed by the Debtors pursuant to the provisions in Article V herein to the extent assumable and shall remain obligations of the Reorganized Debtors, irrespective of when such obligation arose.

None of the Reorganized Debtors shall amend or restate its certificate of incorporation, bylaws, or similar organizational document after the Effective Date to terminate or materially adversely affect (a) any of the Reorganized Debtors' obligations referred to in this Section 4.7 or (b) the rights of such managers, directors, officers, employees, or agents referred to in this Section 4.7.

Section 4.8    *Cancellation of Existing Securities and Agreements.*

(a)    On the Effective Date, except as otherwise specifically provided for in this Plan, including with respect to the Amended and Restated First Lien Documents: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws or certificate or articles of incorporation or similar documents

governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to this Plan, if any) shall be released and discharged.

(b)      Notwithstanding such cancellation and discharge:

(i)      The Interests of the Debtors or Reorganized Debtors, as applicable, in their direct and indirect subsidiaries, including the Non-Debtor Obligors, shall remain unaffected by this Plan.

(ii)     The DIP Facility Documents shall continue in effect solely for purposes of allowing the DIP Agent to (A) receive distributions from the Debtors under this Plan and to make further distributions to the Holders of the DIP Claims on account of such DIP Claims, as set forth in Article VI hereof; (B) enforce its rights, Claims, and interests with respect to the DIP Lenders; (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of DIP Claims, including any rights to priority of payment with respect to the DIP Lenders; and (D) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the DIP Agent or Holders of DIP Claims under this Plan.

(iii)    The Existing Second Lien Documents shall continue in effect solely for purposes of allowing the Existing Second Lien Agent to: (A) receive distributions from the Debtors under this Plan and to make further distributions to the Holders of the Existing Second Lien Claims on account of such Existing Second Lien Claims, as set forth in Article VI hereof; (B) enforce its rights, Claims, and  interests with respect to the Existing Second Lien Lenders; (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Existing Second Lien Claims, including any rights to priority of payment with respect to the Existing Second Lien Lenders; and (D) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the Existing Second Lien Agent or Holders of Existing Second Lien Claims under this Plan.

Section 4.9      *Cancellation of Certain Existing Security Interests*.

(a)      Upon the full payment or other satisfaction of an Allowed Other Secured Claim, Allowed DIP Claim, Allowed Existing Second Lien Claim, and Allowed Globalex Secured Note Claim or promptly thereafter, the Holder of such Claims shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of  satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any

related financing statements, guaranties, including the Existing Second Lien Non-Debtor Obligor Guaranties, mortgages, mechanics' or other Liens, including the Existing Second Lien Non-Debtor Obligor Liens, or *lis pendens*, or similar interests or documents.

(b)     Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, including the Existing Second Lien Non-Debtor Obligor Guaranties, mortgages, deeds of trust, Liens, including the Existing Second Lien Non-Debtor Obligor Liens, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, including the Existing Second Lien Non-Debtor Obligor Guaranties, mortgages, deeds of trust, Liens, including the Existing Second Lien Non-Debtor Obligor Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Section 4.10    *The Amendment and Restatement; Exchange.*

(a)     On the Effective Date, the Existing First Lien Credit Agreement shall be amended and restated in substantially the form of the Amended and Restated First Lien Credit Agreement attached to the Plan Supplement, and the Existing First Lien Agent and each Existing First Lien Lender party to the Existing First Lien Credit Agreement on the Effective Date shall be deemed to consent to the Amended and Restated First Lien Credit Agreement in the form attached to the Plan Supplement (including as such amendments relate to the Non-Debtor Obligors), which amendment shall, among other things, cancel the Existing Revolving Credit Loans and approve the newly issued "Revolving Commitments" as that term is used in the Amended and Restated First Lien Credit Agreement and accept such agreement in full substitution of the Existing First Lien Credit Agreement without any further action on the part of any lender or the obligors under such agreement.  Except as otherwise provided for in this Plan, on the Effective Date and upon the amendment and restatement of the Amended and Restated First Lien Credit Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, the obligations of the Debtors and Non-Debtor Obligors under the Existing First Lien Credit Agreement shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors and their Affiliates shall not have any continuing obligations thereunder.  Further, no provisions of the Existing First Lien Credit Agreement that impose liabilities on the Debtors shall survive and any and all defaults or events of defaults under the Existing First Lien Credit Agreement shall be deemed permanently waived or cured, as applicable.

(b)     On the Effective Date, each Holder of an Allowed Existing Second Lien Claim shall exchange (i) 75% (or a larger or smaller portion)[3] of its Allowed Existing Second Lien Claims for its Pro-Rata Share of the Reorganized Common Equity in the amount set forth in **Schedule 1** line EF (subject to dilution from the Management Incentive Plan and the conversion of New Convertible Preferred Equity) and (ii) 25% (or a larger or smaller portion) of its Allowed Existing

---

[3]     The amount of such portion to be determined based on the fair market value of the Reorganized Common Equity and the New Mezzanine Debt Loans, and, when combined with the portion exchanged for the New Mezzanine Debt Loans, shall equal 100% of the Allowed Existing Second Lien Claims.

Second Lien Claims for its Pro-Rata Share of New Mezzanine Debt Loans in the amount set forth in **Schedule 1** line BB.

Section 4.11    *The Sponsor Contributions*.

(a)    On the Effective Date, the Sponsor shall provide the Sponsor Contributions, which shall include:  (i) the entirety of the Sponsor Globalex Interest; and (ii) the exchange or forgiveness of (whichever is most efficient for tax purposes) all amounts outstanding and obligations owed to the Sponsor Lender pursuant to the Globalex Secured Note, the Vox Unsecured Promissory Note, and the OSG February 8 Unsecured Promissory Note.  In exchange for or forgiveness of (whichever is most efficient for tax purposes) the Sponsor Contributions, on the Effective Date, the Sponsor shall receive New Convertible Preferred Equity in the amount set forth in **Schedule 1**.  Except as otherwise provided for in this Plan, on the Effective Date and without further notice to or order of the Bankruptcy Court, act or action under applicable law, the obligations of the Debtors under the Globalex Secured Note, the Vox Unsecured Promissory Note, and the OSG February 8 Unsecured Promissory Note shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors and their Affiliates shall not have any continuing obligations thereunder.  Further, no provisions of the Globalex Secured Note, the Vox Unsecured Promissory Note, and the OSG February 8 Unsecured Promissory Note that impose liabilities on the Debtors shall survive.

(b)    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Sponsor Contributions as incorporated into this Plan pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Sponsor Contributions are fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests.  The Debtors are authorized to execute and deliver any documents necessary or appropriate to implement the Sponsor Contributions without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent authorization, or approval of any Person.

Section 4.12    *Approval of the Amended and Restated First Lien Facility, the Amended and Restated First Lien Documents, the New Mezzanine Debt Facility, and the New Mezzanine Debt Documents*.

(a)    On the Effective Date, the Reorganized Debtors' funded debt shall include the Amended and Restated First Lien Facility and the New Mezzanine Debt Facility.  The Reorganized Debtors may use the Amended and Restated First Lien Facility for any purpose permitted by the Amended and Restated First Lien Documents and the New Mezzanine Debt Facility for any purpose permitted by the New Mezzanine Debt Documents, including the funding of obligations under this Plan and satisfaction of ongoing working capital needs.

(b)    Confirmation of this Plan shall be deemed to constitute approval of the Amended and Restated First Lien Facility, the Amended and Restated First Lien Documents, the New Mezzanine Debt Facility, and the New Mezzanine Debt Documents (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Amended and Restated First Lien Facility and the New Mezzanine Debt Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection

therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the Amended and Restated First Lien Documents and the New Mezzanine Debt Documents, and such other documents as may be reasonably required or appropriate, in each case, in accordance therewith.

(c)     The Amended and Restated First Lien Documents and the New Mezzanine Debt Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Amended and Restated First Lien Documents and the New Mezzanine Debt Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.

(d)     On the Effective Date, all of the Liens and security interests granted or to be granted in accordance with the Amended and Restated First Lien Documents (including all Liens and security interests that were previously granted under the Existing First Lien Documents) shall (or, in the case of Liens and security interests previously granted under the Existing First Lien Documents, shall continue to):  (i) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Amended and Restated First Lien Documents, including with respect to the Non-Debtor Obligors; (ii) be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the New First Lien Agents or any of the Amended and Restated First Lien Lenders, perfected on the Effective Date on a first-priority basis, subject only to (solely with respect to the first-priority nature of such Liens and security interests) such Liens and security interests as may be permitted to be senior thereto under the Amended and Restated First Lien Documents; and (iii) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

Section 4.13     *Treatment of the Existing Second Lien Non-Debtor Obligor Guaranties, and the Existing Second Lien Non-Debtor Obligor Liens.*

(a)     On the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan to Holders of Existing First Lien Claims and Existing Second Lien Claims,

the Existing Second Lien Non-Debtor Obligor Guaranties and the Existing Second Lien Non-Debtor Obligor Liens held by any Holder of an Existing Second Lien Claim (whether held individually or by the Existing Second Lien Agent) relating to the Existing Second Lien Facility, as applicable, shall be fully and automatically released and discharged. In addition, at the sole expense of the Debtors or the Reorganized Debtors, as applicable, the Existing Second Lien Agent shall execute and deliver all documents reasonably requested by the Required Consenting Stakeholders or the Reorganized Debtors to evidence the release of the Existing Second Lien Non-Debtor Obligor Guaranties and the Existing Second Lien Non-Debtor Obligor Liens. The Reorganized Debtors and their designees shall be authorized to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect to the foregoing.

Section 4.14    *Issuance of the New Convertible Preferred Equity and the Reorganized Common Equity.*

(a)    Units of the New Convertible Preferred Equity and the Reorganized Common Equity (including the Reorganized Common Equity issuable upon the conversion of the New Convertible Preferred Equity) shall be authorized under the New Organizational Documents. Units of the New Convertible Preferred Equity and the Reorganized Common Equity shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with this Plan. All of the New Convertible Preferred Equity and Reorganized Common Equity issuable in accordance with this Plan (including the Reorganized Common Equity issuable upon the conversion of the New Convertible Preferred Equity), when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the New Convertible Preferred Equity and the Reorganized Common Equity are authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

(b)    All Existing Holdings Preferred Interests and all Existing Holdings Common Interests outstanding prior to Consummation (including all rights exchangeable or exercisable for shares of Existing Holdings Common Interests) shall be extinguished upon Consummation and Holders thereof shall not receive any payment or property on account of any such shares of capital stock, except in accordance with Article III of this Plan.

Section 4.15    *Contingent Value Rights Pool.*

(a)    As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue the CVR Certificates only to the extent required to provide for distributions from the Contingent Value Rights Pool to applicable Holders of Existing Holdings Preferred Interests and to applicable Holders of Existing Holdings Common Interests. All of the CVR Certificates and the Contingent Value Rights Pool shall be duly authorized without the need for any corporate action, and without any further action by the Debtors or the Reorganized Debtors, as applicable, shall be validly issued, fully paid, and non-assessable.

(b)    As soon as reasonably practicable after the Effective Date, each Holder of Existing Holdings Preferred Interests and each Holder of Existing Holdings Common Interests who timely delivers an Opt-In Form pursuant to Article III hereof shall receive the CVR Certificates for the Contingent Value Rights Pool. For the avoidance of doubt, the Sponsor shall have been deemed

to have timely executed and delivered the Opt-In Form pursuant to Article III hereof and shall receive the CVR Certificates for the Contingent Value Rights Pool.

Section 4.16    *Exit Capital*.

(a)    Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive New Convertible Preferred Equity issued by Reorganized Holdings on the Effective Date and New Mezzanine Debt Loans issued by Reorganized Intermediate on the Effective Date, the amounts of which are set forth in **Schedule 1** lines F through T attached hereto.

(b)    On the Effective Date, the Consenting Second Lien Lenders shall invest $21,800,000 of new money as set forth in **Schedule 1** lines CZ through DF attached hereto into Reorganized Holdings in exchange for the amount of New Convertible Preferred Equity as set forth in **Schedule 1** attached hereto.  In addition, on the Effective Date, the Consenting Second Lien Lenders shall provide $23,200,000 of new-money in the form of New Mezzanine Debt Loans as set forth in **Schedule 1** lines BR through BX attached hereto pursuant to the New Mezzanine Debt Facility as contemplated under the New Mezzanine Debt Documents.

(c)    Confirmation of this Plan shall be deemed approval of the exit capital contemplated in (a) and (b) of this Section 4.15 and the documents in connection with such exit capital, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors to enter into and execute any other documents necessary to effectuate the transactions in this Section 4.15.

Section 4.17    *Sponsor Globalex Interest and Globalex Secured Note*.

(a)    On the Effective Date, the Sponsor Globalex Interest shall be contributed to Globalex and the Globalex Secured Note shall be retired (through contribution to Globalex or otherwise), and Globalex shall become a "loan party" under the Amended and Restated First Lien Documents.  For the avoidance of doubt, the Sponsor shall surrender the Sponsor Globalex Interest and the Globalex Secured Note upon Consummation in exchange for the treatment set forth in Article III of this Plan.  Reorganized Output Services Group shall thereafter own 100% of the Interests in Globalex.

(b)    On the Effective Date, the Reorganized Debtors, the Holders of New Convertible Preferred Equity, and the Holders of Reorganized Common Equity shall enter into, or be deemed to enter into, the New Organizational Documents in substantially the form included in the Plan Supplement.  The New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Convertible Preferred Equity and Reorganized Common Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

Section 4.18   *UK DB Plan.*

On or prior to the Effective Date, the Company shall have used commercially reasonable best efforts to obtain the UK Pension Approvals and Ratification, which shall include confirmations given by the Company or received by the Company and the Consenting Stakeholders, in form and substance satisfactory to the Company and the Plan Sponsor Parties, after consultation with the Required Consenting First Lien Lenders and the Sponsor, (A) relating to the UK DB Plan, including that (i) the Trustee has been notified of the key terms of the Restructuring Transactions relevant to the UK DB Plan's employer covenant; (ii) the Trustee has confirmed in writing that it either (a) considers the Restructuring Transactions will not be materially detrimental to the covenant supporting the UK DB Plan or (b) it does not object to the Restructuring Transactions proceeding, (iii) the Trustee has not notified the Company of its intention to carry out an actuarial valuation (within the meaning of s.224(2)(a) of the UK Pensions Act 2004) for the UK DB Plan with an effective date of earlier than March 31, 2023, not requested or demanded any employer contributions in addition to those set out in the recovery plan and schedule of contributions dated July 27, 2021 to, or other financial support for, the UK DB Plan (except for any amended and restated version of the Pension Guarantee that may be agreed pursuant to the restructuring term sheet annexed as <u>Exhibit C</u> to the Restructuring Support Agreement) and not triggered or threatened to trigger the winding-up of the UK DB Plan (in whole or in part) and (iv) the Pension Regulator shall not have raised any material concerns in relation to the Restructuring Transactions, issued, or indicated that it will issue, a warning notice in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan for the purposes of the UK Pensions Act 2004, issued a contribution notice or financial support direction in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan for the purposes of the UK Pensions Act 2004 or exercised or threatened to exercise any power, or impose any penalty, in relation to the Restructuring Transactions or otherwise in relation to the UK DB Plan pursuant to section 58A, section 58B, section 58C, or section 58D of the UK Pensions Act 2004; and (B) evidencing that Output Services Group shall have assumed the Pension Guarantee or have agreed with the Trustee an amended and restated version of the Pension Guarantee or other security or financial support in form and substance satisfactory to the Trustee, the Company, and the Plan Sponsor Parties.

Section 4.19   *Vox Contribution.*

(a)      On the Effective Date, the equity interests in the Vox Entities shall be transferred from Intermediate to non-Debtor Affiliate Communisis Limited (the "<u>Vox Contribution</u>") pursuant to the transaction steps in the Restructuring Transactions Memorandum.

(b)      Immediately after the Vox Contribution, the Vox Entities shall provide the New Vox Guaranties under the Amended and Restated First Lien Documents; *provided* that certain Vox Entities, including Vox Europe B.V., Vox Supply Group Trading (Suzhou Co. Ltd.), and Vox Marketing Ltd, shall not provide the New Vox Guaranties under the Amended and Restated First Lien Documents.

(c)      Upon entry of the Confirmation Order, the Vox Contribution Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms.  The Debtors are authorized to execute and deliver any documents necessary or appropriate to implement the Vox

47

Contribution without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, vote, consent authorization, or approval of any Person.

Section 4.20   *Exemption from Registration Requirements.*

The issuance of the New Convertible Preferred Equity (including the Reorganized Common Equity issuable upon conversion thereof), the Reorganized Common Equity and, to the extent they constitute "securities," the CVR Certificates under this Plan shall be exempt from registration under the Securities Act and any other applicable securities Laws pursuant to section 1145 of the Bankruptcy Code or section 4(a)(2) under the Securities Act. This Plan's securities issued in reliance on section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to offering, issuance, or sale. These securities may be resold without registration under the Securities Act or other federal securities Laws and will be freely tradable, unless the Holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, an "affiliate" of the Reorganized Debtors as defined in rule 144(a)(1) under the Securities Act, or was an affiliate within ninety (90) days of the proposed transfer, and in each case subject to compliance with applicable securities laws and any applicable restrictions in the New Organizational Documents and the CVR Agreement. In addition, such securities issued under section 1145 of the Bankruptcy Code may generally be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states. Securities issued under section 4(a)(2) or other comparable exemptions under the Securities Act and state securities laws may not be resold absent registration under the Securities Act or the availability of an exemption from such registration.

Section 4.21   *Organizational Documents.*

Subject to Article V of this Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of this Plan. The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

Section 4.22   *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other

documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

Section 4.23   *Managers, Directors and Officers of the Reorganized Debtors.*

The members of the Reorganized Board will be designated in accordance with the governance term sheet annexed as <u>Exhibit E</u> to the Restructuring Support Agreement and the Plan Supplement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager, or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager, or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

Section 4.24   *Management Incentive Plan.*

All existing equity incentive plans of the Debtors shall be terminated.  As soon as reasonably practicable after the Effective Date, and consistent with the agreement of the Plan Sponsor Parties, Reorganized Holdings will implement a Management Incentive Plan.

Section 4.25   *Effectuating Documents; Further Transactions.*

(a)      Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the Restructuring Support Agreement, the DIP Facility Documents, the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the CVR Agreement and the CVR Certificates, the Vox Contribution Documents, the amended and restated Pension Guarantee, the New Organizational Documents, and any securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

(b)      The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

Section 4.26    *Restructuring Expenses.*

(a)      Subject to the terms of section 7.04 of the Restructuring Support Agreement, the Restructuring Expenses shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the terms of the Restructuring Support Agreement (including any exhibits thereto) without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date (or such other period as the Debtors and the Required Consenting Stakeholders may agree).  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, subject to the terms of section 7.04 of the Restructuring Support Agreement, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, enforcement, and defense of this Plan whether incurred before, on, or after the Effective Date.

(b)      The Required Consenting Stakeholders have expended, and will continue to expend, considerable time, effort and expense in connection with the negotiation of the Restructuring Transactions, and the Restructuring Transactions provide substantial value to, are beneficial to, and are necessary to preserve, the Debtors, and the Required Consenting Stakeholders have made a substantial contribution to the Debtors and the Restructuring Transactions.  If and to the extent not previously reimbursed or paid pursuant to the terms of and in connection with section 7.04 of the Restructuring Support Agreement and this Section 4.25, subject to the approval of the Bankruptcy Court, the Debtors shall reimburse or pay (as the case may be) all Restructuring Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Restructuring Expenses accrued after the Petition Date are entitled to treatment as, and the Debtors shall seek treatment of such Restructuring Expenses as, Allowed Administrative Claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

Section 4.27    *Retained Causes of Action.*

(a)      Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.27 include any Claim or Cause of Action with respect to, or against, a Released Party.

(b)     **No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

Section 4.28     *No Claims Under Existing Intercreditor Agreement.*

Holders of all Allowed Existing First Lien Claims and Existing Second Lien Claims shall not have any Claims (including, without limitation, for turnover of payments) against the Holders of Existing Second Lien Claims (or the Existing Second Lien Agent) or Existing First Lien Claims (or the Existing First Lien Agent) under the Existing Intercreditor Agreement in any way arising from, relating to or as a result of the Debtors' Restructuring, this Plan (including, without limitation, the treatment of the Existing First Lien Claims or Existing Second Lien Claims under the Plan or the making of distributions to the Holders of the Existing First Lien Claims or Existing Second Lien Claims in accordance with this Plan), the distribution of property by the Debtors under this Plan, any related document or any order of the Bankruptcy Court, or any other transaction, agreement, event, omission or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1     *Assumption of Executory Contracts and Unexpired Leases.*

(a)     All Executory Contracts and Unexpired Leases of the Debtors shall be assumed absent an objection as set forth in Section 5.2 hereof or an order requiring rejection, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Each Executory Contract and Unexpired Lease shall be fully enforceable by the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of this Plan, or by any order of the Bankruptcy Court.

(b)     The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption of all Executory Contracts or Unexpired Leases, as described in this Plan, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assumption and assignment, or rejection, as the case may be, is in the best interests of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to this Plan are effective as of the Effective Date.

(c)     Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all

modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Section 5.2    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)    Unless otherwise agreed in writing by such counterparty, any monetary defaults that are required to be cured to assume an Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in the ordinary course of business. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely raise any objection that could have been raised under section 365 of the Bankruptcy Code shall be deemed to have consented to the Debtors' assumption of such Executory Contract and Unexpired Lease, to the extent any such consent is required, and all such counterparties shall be forever enjoined and barred from objecting to the Debtors' assumption of such Executory Contract and Unexpired Lease for any reason.

(b)    If there is a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, then the Bankruptcy Court shall retain jurisdiction in all respects to hear such disputes; *provided* that the occurrence of any such dispute shall not prevent or delay implementation of this Plan or Effective Date; *provided further* that the Debtors may settle any such dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided further* that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject, or nullify the assumption of, any Executory Contract or Unexpired Lease within thirty (30) days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)    Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise, and the continued performance thereunder (or the payment of a Cure Cost, if any), shall result in the full release, satisfaction, and cure of any defaults thereunder, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory

Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. Any and all Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to this Section 5.2, shall be deemed disallowed and expunged as of the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Section 5.3    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

If the rejection by the Debtors, pursuant to this Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Claim, a Proof of Claim must be served upon the Debtors and their counsel within thirty (30) days after the later of (i) notice of entry of the Confirmation Order or (ii) other notice that the Executory Contract or Unexpired Lease has been rejected. Any Claims not served within such time periods will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates, and their property.

Section 5.4    *Indemnification Obligations.*

Any and all Indemnification Obligations of the Debtors, including pursuant to their corporate charters, agreements, bylaws, limited liability company agreements, memorandum, and articles of association, or other organizational documents, or board resolutions, employment contracts, or other agreements for the directors, officers, managers, employees, attorneys, other professionals, and agents employed by the Debtors to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors based upon any act or omission for or on behalf of the Debtors shall remain in full force and effect to the maximum extent permitted by applicable Law and shall not be discharged, impaired, or otherwise affected by this Plan. All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations in this Section 5.4 herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

Section 5.5    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor including any Executory Contracts and Unexpired Leases assumed by such Debtor shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

Section 5.6    *Insurance Policies.*

All Insurance Policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to this Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

Section 5.7     *Reservation of Rights.*

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

Section 6.1     *Distribution on Account of Claims and Interests Allowed as of the Effective Date.*

Except as otherwise provided in this Plan or a Final Order, or as agreed to by the relevant parties receiving such distributions, distributions under this Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or arising under Executory Contracts or Unexpired Leases assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, orders, course of dealing, course of business, or industry practice and (b) in accordance with Article II of this Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

Section 6.2     *Distribution on Account of Claims and Interests Allowed After the Effective Date.*

(a)     *Payments and Distributions on Disputed Claims.*  Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, distributions under this Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is thirty (30) Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article IX of this Plan and paid.

(b)     *Special Rules for Distributions to Holders of Disputed Claims.*  Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in

connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

(c)    *Timing and Calculation of Amounts to Be Distributed*.  Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. Except as otherwise provided in this Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Section 6.3    *Delivery of Distributions*.

(a)    *Record Date for Distributions*.  On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Date.

(b)    *Delivery of Distributions in General*.  Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims or Allowed Interests (as applicable) shall be made to Holders of record as of the Distribution Date by the Reorganized Debtors at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder.

(c)    *Delivery of Distributions on Account of Existing First Lien Claims*.  The Existing First Lien Agent shall be deemed to be the Holder of the Existing First Lien Claims solely for purposes of distributions to be made hereunder, and all distributions on account of the Existing First Lien Claims in Class 1 shall be made to the Existing First Lien Agent.  As soon as practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the Existing First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Existing First Lien Claims in Class 1 in accordance with the terms of the Existing First Lien Documents and this Plan.  Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the Existing First Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the Existing First Lien Agent.

(d)    *Delivery of Distributions on Account of Existing Second Lien Claims*.  As soon as practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the Debtors or Reorganized Debtors, as applicable, shall arrange to deliver distributions to the Holders of Allowed Existing Second Lien Claims in Class 2.

(e)    *Delivery of Distributions on Account of DIP Claims*.  The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or

on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility, subject to any modifications to such distributions in accordance with the terms of this Plan. Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

Section 6.4     *Minimum Distributions.*

No fractional units of New Convertible Preferred Equity, Reorganized Common Equity, or CVR Certificates shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to this Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of units of New Convertible Preferred Equity, Reorganized Common Equity, or CVR Certificates that is not a whole number, the actual distribution of units of New Convertible Preferred Equity, Reorganized Common Equity, or CVR Certificates shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized units of New Convertible Preferred Equity, Reorganized Common Equity, or CVR Certificates to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

Section 6.5     *Foreign Currency Exchange Rate.*

Other than with respect to the Existing First Lien Claims and except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date. Notwithstanding the foregoing, all Existing Second Lien Loans to be converted to New Mezzanine Debt Loans and Reorganized Common Equity in accordance with the Restructuring Transactions, as applicable, shall be converted to the Dollar Equivalent (as defined in the Existing Second Lien Credit Agreement) of such amount of Second Lien Loans at the Spot Rate (as defined in the Existing Second Lien Credit Agreement) in effect on May 31, 2022.

Section 6.6     *Delivery of Distributions; Undeliverable Distributions.*

(a)     Pursuant to Article III, Section 3.2(e) hereof, Holders of Allowed General Unsecured Claims may receive payment in full in Cash paid in the ordinary course of business if (i) not otherwise Reinstated or (ii) not given other less favorable treatment as reasonably agreed to by the Debtors and the Plan Sponsor Parties after consultation with the Required Consenting First Lien Lenders. Distributions to Holders of Allowed General Unsecured Claims, Holders of Existing Holdings Preferred Interest (as applicable), and Holders of Existing Holdings Common Interests (as applicable) shall be made by the Reorganized Debtors at the address set forth in the Reorganized Debtors' books and records. Distributions to Holders of Allowed Existing First Lien Claims and Existing Second Lien Claims shall be made by the Existing First Lien Agent and the Existing Second Lien Agent, respectively, at the address set forth in the Existing First Lien Agent's and the Existing Second Lien Agent's respective system. If any Holder's distribution is returned

as undeliverable, no further distributions to such Holder shall be made unless and until the Reorganized Debtors, Existing First Lien Agent, or the Existing Second Lien Agent, as applicable, is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. The Existing First Lien Agent and the Existing Second Lien Agent shall deliver any non-deliverable Cash, New Convertible Preferred Equity or Reorganized Common Equity to the Reorganized Debtors no later than ten (10) Business Days following the first anniversary of the Effective Date. All Claims for undeliverable distributions must be made within one (1) year after the Effective Date, after which date the Claim of any Holder or successor to such Holder with respect to such property will be discharged and forever barred. After such date, any unclaimed or un-deliverable distribution of Cash to Holders of Allowed General Unsecured Claims shall become property of the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Convertible Preferred Equity, Reorganized Common Equity, CVR Certificates or amounts available pursuant to the Contingent Value Rights Pool held for distribution shall be canceled and of no further force or effect. Nothing contained in this Plan shall require the Reorganized Debtors, the Existing First Lien Agent, or the Existing Second Lien Agent, to attempt to locate any Holder of an Allowed Claim.

(b)    *Failure to Present Checks*. Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtors or their property. Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

Section 6.7    *Compliance with Tax Requirements/Allocations.*

In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the applicable Holder of the Allowed Claim or Allowed Interest.

Section 6.8      *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by this Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors.  Except as otherwise expressly provided in this Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interests, which shall continue in effect.  Notwithstanding anything to  the  contrary herein, this  paragraph  shall  not  apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

Section 6.9      *Claims Paid or Payable by Third Parties.*

(a)      *Claims Paid by Third Parties*.  The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

(b)      *Claims Payable by Insurance*.  No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' Insurance Policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policies.  To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      *Applicability of Insurance Policies*.  Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

Section 7.1    *Resolution of Disputed Claims Process.*

(a)    Except as provided otherwise in this Plan or by order of the Bankruptcy Court, Holders of Claims shall not be required to file Proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent or unliquidated Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced and all of the Debtors' legal and equitable rights in respect of any such Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced; *provided*, *however*, that the Debtors reserve the right to file with the Bankruptcy Court, on or before the Claims Objection Deadline, an objection to any Claim as to which the Holder of such Claim has filed a Proof of Claim in the Chapter 11 Cases; *provided further* that this Section 7.1(a) shall not apply to any objections or disputes, including any objection or dispute that could have been raised under section 365 of the Bankruptcy Code, with respect to the Debtors' assumption of Executory Contracts and Unexpired Leases under this Plan, and any such objections or disputes shall be subject in all respects to Sections 5.1 and 5.2 of this Plan. The Debtors shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction the validity, nature, or amount thereof.

(b)    In addition, the Debtors or the Holder of a contingent or unliquidated Claim may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

Section 7.2    *Allowance of Claims and Interests.*

(a)    Except as provided in Article IX hereof, each of the Reorganized Debtors after the Effective Date shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under this Plan.

(b)     Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.

Section 7.3     *Prosecution of Objections to Claims.*

Except as otherwise specifically provided in this Plan or order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Section 7.4     *Adjustment to Claims and Interests Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.5     *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to the Reorganized Debtors.  All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.6     *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the

making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.7    *Amendments to Claims or Interests.*

On or after the Effective Date, except as provided herein, a Claim or Interest may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim or Interest filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1    *Conditions Precedent to the Effective Date.*

The following are conditions precedent to the Effective Date that must be satisfied, waived pursuant to section 8.2 of the Plan or are condition that must be satisfied substantially contemporaneous with consummation of the Restructuring Transactions, as applicable:

(a)    the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions (including, without limitation, shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date:  (a) the New Organizational Documents; (b) the Amended and Restated First Lien Documents; (c) the New Mezzanine Debt Documents; (d) the Management Incentive Plan; (e) the CVR Agreement and the CVR Certificates; (f) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Restructuring Support Agreement and this Plan; (g) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions, and (h) all other material customary documents delivered in connection with transactions of this type (including, without limitation, any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions);

(b)    the Restructuring Support Agreement shall not have been terminated in accordance with its terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit any Required Consenting Stakeholder or the Sponsor to terminate the Restructuring Support Agreement in accordance with its terms upon the expiration of such time; *provided*, *however*, that, solely for the purposes of this Section 8.1(b), any election to terminate the Restructuring Support Agreement as a result of such event, act, or omission must be made within one (1) Business Day of the Required Consenting Stakeholders or the Sponsor becoming aware of such act, or omission that that would entitle them to terminate the Restructuring Support Agreement in accordance

with its terms; *provided further*, for the avoidance of doubt, other than the foregoing, it is not a condition precedent to the Restructuring that a termination event that permits a Required Consenting Stakeholder or the Sponsor to terminate the Restructuring Support Agreement does not exist.

(c)     the Bankruptcy Court shall have entered the Confirmation Order in accordance with the terms and conditions of the Restructuring Support Agreement in all respects, and shall not be stayed, modified, revised, or vacated, and shall not be subject to any pending appeal;

(d)     the Bankruptcy Court shall have entered the Disclosure Statement Order in accordance with the terms and conditions of the Restructuring Support Agreement in all respects, and shall not be stayed, modified, revised, or vacated, and shall not be subject to any pending appeal;

(e)     the Bankruptcy Court shall have entered the DIP Orders in accordance with the terms and conditions of the Restructuring Support Agreement in all respects, and shall not be stayed, modified, revised, or vacated, and shall not be subject to any pending appeal;

(f)     the Company shall have a minimum of $12.5 million in cash on its consolidated balance sheet, unless such condition is waived in writing by the Plan Sponsor Parties, with written notice to counsel to the Company, the Consenting First Lien Lenders and the Sponsor, with e-mail being sufficient;

(g)     all of the actions set forth in the Restructuring Transactions Memorandum shall have been completed and implemented;

(h)     each of (a) the Amended and Restated First Lien Facility, (b) the New Mezzanine Debt Facility, (c) the New Convertible Preferred Equity, and (d) the Reorganized Common Equity shall have been issued and any funding required thereunder shall have occurred substantially contemporaneously with consummation of the Restructuring Transactions, in each case, in accordance with the terms of the Restructuring Support Agreement and the documents and agreements governing the same;

(i)     all documents, certificates, and agreements necessary to implement this Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(j)     all actions necessary to implement this Plan shall have been effected;

(k)     all requisite governmental, regulatory, and material third party approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained;

(l)     there shall be no ruling, judgment, or order issued by any Governmental Unit making illegal, enjoining or otherwise preventing or prohibiting the consummation of the Restructuring Transactions;

(m)     the aggregate amount of (i) all Allowed Professional Fee Claims approved by the Bankruptcy Court prior to the Effective Date if any (less any amounts thereof paid), plus (ii) all Professional Fee Claims that have accrued as of the Effective Date but may become Allowed after the Effective Date, shall not exceed the Professional Fee Reserve Amount;

(n)     the Professional Fee Escrow Account shall have been established and the Professional Fee Reserve Amount shall have been funded (or shall be funded substantially contemporaneously with consummation of the Restructuring Transactions) in accordance with this Plan;

(o)     the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the Effective Date in accordance with section 7.04 of the Restructuring Support Agreement;

(p)     the guarantees, mortgages, deeds of trust, Liens, pledges, or other security interests held by all Holders of Existing First Lien Loans or Existing Second Lien Loans (whether held individually or by the Existing First Lien Agent or the Existing Second Lien Agent) against any Non-Debtor Obligor shall be fully released and discharged (or will be fully released and discharged substantially contemporaneously with the consummation of the Restructuring Transactions);

(q)     the conditions to the effectiveness of the Amended and Restated First Lien Facility set forth in the Amended and Restated First Lien Credit Agreement (other than the occurrence of the Effective Date) shall have been satisfied or waived;

(r)     the conditions of the effectiveness of the New Mezzanine Debt Facility set forth in the New Mezzanine Debt Credit Agreement (other than the occurrence of the Effective Date) shall have been satisfied or waived;

(s)     the Company shall have used commercially reasonable best efforts to obtain the UK Pension Approvals and Ratification; and

(t)     such other conditions as mutually agreed by the Debtors and the Required Consenting Stakeholders, after consultation with the Sponsor.

For the avoidance of doubt, any condition that requires any agreement, order or document to be in full force and effect, or entered by the Bankruptcy Court, as applicable, shall include a requirement that such agreement, order or document is consistent with the Restructuring Support Agreement and otherwise in form and substance as set forth in the Restructuring Support Agreement.

Section 8.2    *Waiver of Conditions Precedent.*

The Debtors or the Reorganized Debtors, as applicable, with the prior written consent of the Required Consenting First Lien Lenders, each of the Plan Sponsor Parties, and (solely to the extent such waiver adversely affects, or upon the effectiveness thereof will adversely affect, the economic treatment of the Sponsor under the Plan, or the rights expressly provided to the Sponsor under the Plan) the Sponsor subject to section 1.2(e) of this Plan, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm this Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

Section 8.3    *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur prior to or on the Outside Date (as may be extended by agreement of the Plan Sponsor Parties, Required Consenting First Lien Lenders, and the Sponsor in accordance with the Restructuring Support Agreement), then:  (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan, the Confirmation Order, or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Section 8.4    *Substantial Consummation of Plan.*

Substantial consummation of this Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

# ARTICLE IX.

# EFFECT OF PLAN CONFIRMATION

Section 9.1    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, the Consenting Stakeholders, and each Holder of a Claim against or Interest in any Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized

Debtor's, the Consenting Stakeholders', and Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under this Plan and whether such Holder has accepted or rejected this Plan or is deemed to have accepted or rejected this Plan.

Section 9.2    *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their properties, including property of the Estates, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is Allowed; or (iii) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, this Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

Section 9.3    *Releases.*

(a)    ***RELEASES BY THE DEBTORS.***    TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS) AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, EACH RELEASED PARTY SHALL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY EACH AND ALL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURE OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE,

**INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES, OR THEIR AFFILIATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE SPONSOR, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE DEBTORS' RESTRUCTURING EFFORTS, THE INCURRENCE OF THE GLOBALEX SECURED NOTE, THE VOX UNSECURED PROMISSORY NOTE, AND THE OSG FEBRUARY 8 UNSECURED PROMISSORY NOTE, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE CONFIRMATION ORDER, THE DISCLOSURE STATEMENT ORDER, THE OPT-IN FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATING TO THE RESTRUCTURING TRANSACTIONS), OR ANY OTHER DOCUMENTS (INCLUDING**

ANY LEGAL OPINION IN EFFECT PRIOR TO THE EFFECTIVE DATE THAT WAS REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THIS PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THIS PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, THE PLAN SUPPLEMENT, OR THE DIP FACILITY DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THIS PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THIS PLAN, THE PLAN SUPPLEMENT, THE CONFIRMATION ORDER, THE DISCLOSURE STATEMENT, THE DISCLOSURE STATEMENT ORDER, THE DIP FACILITY DOCUMENTS, THE OPT-IN FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATING TO THE RESTRUCTURING TRANSACTIONS), OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT EACH DEBTOR RELEASE IS (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF SUCH CLAIMS; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR PROPERTY.

(b) *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS.* AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR

**FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS) AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURED OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE SPONSOR, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE DEBTORS' RESTRUCTURING EFFORTS, THE INCURRENCE OF THE GLOBALEX SECURED NOTE, THE VOX UNSECURED PROMISSORY NOTE, AND THE OSG FEBRUARY 8 UNSECURED PROMISSORY NOTE, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF**

**SECURITIES PURSUANT TO THIS PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE CONFIRMATION ORDER, THE DISCLOSURE STATEMENT ORDER, THE OPT-IN FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATED TO THE RESTRUCTURING TRANSACTIONS), OR ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION IN EFFECT PRIOR TO THE EFFECTIVE DATE THAT WAS REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THIS PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THIS PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATED TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, THE PLAN SUPPLEMENT, OR THE DIP FACILITY DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THIS PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THIS PLAN, THE PLAN SUPPLEMENT, THE CONFIRMATION ORDER, THE DISCLOSURE STATEMENT, THE DISCLOSURE STATEMENT ORDER, THE DIP FACILITY DOCUMENTS, THE OPT-IN FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATING TO THE RESTRUCTURING TRANSACTIONS), OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.**

Section 9.4    *Exculpation and Limitation of Liability.*

(a)    **UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND**

**OTHER PROFESSIONAL ADVISORS AND AGENTS SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.**

(b)     **EXCEPT WITH RESPECT TO ANY WILLFUL MISCONDUCT OR FRAUD AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, AND ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, TO THE FULLEST EXTENT PERMITTED BY LAW, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY AND ALL CLAIMS AND CAUSES OF ACTION ARISING ON OR AFTER THE PETITION DATE AND ANY AND ALL CAUSES OF ACTION RELATING TO ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, SOLICITING, CONFIRMING, CONSUMMATING, ENTRY INTO, OR FILING OF, AS APPLICABLE, THIS PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE DISCLOSURE STATEMENT ORDER, THE DIP FACILITY DOCUMENTS, THE CONFIRMATION ORDER, THE OPT-IN FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATED TO THE RESTRUCTURING TRANSACTIONS),     ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION IN EFFECT PRIOR TO THE EFFECTIVE DATE THAT WAS REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THIS PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THIS PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATED TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, THE PLAN SUPPLEMENT, OR THE DIP FACILITY DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THIS PLAN, ANY TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION**

**WITH THE DEBTORS, THE DEBTORS' BUSINESS OR CAPITAL STRUCTURE, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, OR ANY MATTERS RELATED THERETO, IN EACH CASE ARISING ON OR PRIOR TO THE EFFECTIVE DATE.**

(c)    **THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE SPONSOR CONTRIBUTIONS, THE VOX CONTRIBUTION, THE AMENDMENT AND RESTATEMENT OF THE EXISTING FIRST LIEN CREDIT AGREEMENT AND DISTRIBUTIONS OF NEW MEZZANINE DEBT LOANS, NEW CONVERTIBLE PREFERRED EQUITY, REORGANIZED COMMON EQUITY, AND THE CVR AGREEMENT AND CVR CERTIFICATES, PURSUANT TO THIS PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN OR SUCH CONTRIBUTIONS OR DISTRIBUTIONS MADE PURSUANT TO THIS PLAN.**

Section 9.5    *Injunction.*

**THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE IX OF THIS PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY ENTITY BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THIS PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.**

Section 9.6    *Setoffs and Recoupment.*

(a)    Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

(b)    In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable,

71

unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XI, Section 11.10 hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Section 9.7     *Release of Liens.*

(a)     Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and Non-Debtor Obligors shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

(b)     To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, nature, validity, amount, or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

(b)     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)     Resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any

potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)    Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of this Plan;

(e)    Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

(g)    Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)    Resolve any and all avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

(i)    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(j)    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

(k)    Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of this Plan;

(m)    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(n)    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

(o)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(p)    Determine any other matters that may arise in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Support Agreement, or

any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

(q)     Enter an order or final decree concluding or closing the Chapter 11 Cases;

(r)     Adjudicate any and all disputes arising from or relating to distributions under this Plan;

(s)     Consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(t)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the CVR Agreement and the CVR Certificates, the New Organizational Documents, the Vox Contribution Documents, and the Management Incentive Plan, which such disputes shall be adjudicated in accordance with the terms of the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the CVR Agreement and the CVR Certificates, the New Organizational Documents, the Vox Contribution Documents, and the respective documents evidencing the Management Incentive Plan, respectively; *provided*, *however*, that the Bankruptcy Court will retain jurisdiction to hear and determine disputes arising in connection with the release of the Existing First Lien Non-Debtor Obligor Guaranties and the Existing First Lien Non-Debtor Obligor Liens under the Existing First Lien Documents and the issuance of the Amended and Restated Non-Debtor Obligor Guaranties and the Amended and Restated Non-Debtor Obligor Liens and, to the extent applicable, the new Liens and guaranties by the Vox Entities and Globalex.

(u)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v)     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(w)     Enforce all orders previously entered by the Bankruptcy Court; and

(x)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

Section 11.2   *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the U.S. Trustee and Reorganized Debtors, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

Section 11.3   *Amendments.*

(a)      *Plan Modifications*.  Subject to the limitations contained in this Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules:  (a) to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; *provided* that such amendment in (a) or (b) above shall be acceptable to the Plan Sponsor Parties and Required Consenting First Lien Lenders and shall otherwise be subject to the consent rights set forth in section 3.03 of the Restructuring Support Agreement.

(b)      *Effect of Confirmation on Modifications*.  Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)      *Certain Technical Amendments*.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided* that such technical adjustments and modifications be acceptable

to the Plan Sponsor Parties and Required Consenting First Lien Lenders and shall otherwise be subject to the terms of section 3.03 of the Restructuring Support Agreement.

Section 11.4 *Revocation or Withdrawal of Plan.*

Subject to the conditions to the Effective Date and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) this Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in this Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

Section 11.5 *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or other federal Law, rule, or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to this Plan (including, without limitation, the DIP Facility Documents, the Amended and Restated First Lien Documents, the New Mezzanine Debt Documents, the CVR Agreement and the CVR Certificates, the New Organizational Documents, the Management Incentive Plan, and the Vox Contribution Documents), provides otherwise, this Plan shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to the principles of conflict of Laws thereof that would require application of the Law of another jurisdiction.

Section 11.6 *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 11.7 *No Successor Liability.*

Except as otherwise expressly provided in this Plan and the Confirmation Order, the Reorganized Debtors (a) are not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) are not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

Section 11.8    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors and with the consent of the Plan Sponsor Parties and the Sponsor, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.9    *Filing of Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.   The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

Section 11.10   *Reservation of Rights.*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.   None of the filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

Section 11.11   *Service of Documents.*

After the Effective Date, any pleading, notice, or other document required by this Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

> Output Services Group, Inc.
> 775 Washington Avenue
> Carlstadt, NJ 07072
> Attn:   Eric Ek
> Email:  eric.ek@osgconnect.com

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attn:     Gregg M. Galardi
          Cristine Pirro Schwarzman
Email:   Gregg.Galardi@ropesgray.com
         Cristine.Schwarzman@ropesgray.com

and

Ropes & Gray LLP
32nd Floor
191 North Wacker Drive
Chicago, Illinois 60606
Attn:     Luke Smith
Email:   Luke.Smith@ropesgray.com

*Proposed Co-Counsel to the Debtors*

and

Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:  efay@bayardlaw.com
         gflasser@bayardlaw.com
         mkotsiras@bayardlaw.com

*Proposed Co-Counsel to the Debtors*

and

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:     Jeffrey R. Poss
          Brian Lennon
E-mail:  jposs@willkie.com
         blennon@willkie.com

*Counsel to the Sponsor*

and

78

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attn:    Jayme Goldstein
          Matthew A. Schwartz
          Christopher Guhin
Email:  jaymegoldstein@paulhastings.com
          mattschwartz@paulhastings.com
          chrisguhin@paulhastings.com

*Counsel to the Consenting First Lien Lenders*

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attn:    Adam J. Goldberg
          Andrew C. Ambruoso
Email:  adam.goldberg@lw.com
          andrew.ambruoso@lw.com

and

Latham & Watkins LLP
99 Bishopsgate
London EC2M 3XF
United Kingdom
Attn:    James Chesterman
          David Wallace
Email:  james.chesterman@lw.com
          david.wallace@lw.com

*Co-Counsel to Pemberton*

and

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attn:    Michael R. Nestor
          Kara Hammond Coyle
Email:  mnestor@ycst.com
          kcoyle@ycst.com

*Co-Counsel to Pemberton*

and

Akin Gump Strauss Hauer & Feld LLP
65 Memorial Road
Suite C340
West Hartford, CT 06107
Attn:    Renée M. Dailey
         Christopher E. Lawrence
Email:  renee.dailey@akingump.com
        chris.lawrence@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Attn:    Jason P. Rubin
Email:  jrubin@akingump.com

*Counsel to GoldPoint*

and

Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attn:    Joseph J. McMahon, Jr.
         Rosa Sierra-Fox
Email:  joseph.mcmahon@usdoj.gov
        rosa.sierra-fox@usdoj.gov

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities informing them that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Section 11.12 *Section 1125(e) of the Bankruptcy Code.*

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy Law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and the Consenting Stakeholders and each of their respective Affiliates, agents, directors,

officers, employees, advisors, and attorneys shall be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under this Plan, and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable Law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

Section 11.13  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.14  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to this Plan are incorporated into and are a part of this Plan as if fully set forth herein.

Section 11.15  *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, this Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

Section 11.16  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 11.17  *Prepayment.*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however*, that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

Section 11.18  *Conflicts.*

In the event of a conflict or inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of a conflict between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order);

provided that in the event any such conflict is a material conflict with the treatment of the Existing First Lien Claims in Class 1, the Existing Second Lien Claims in Class 2, or the Sponsor Contributions in Class 6 of the type that would require the Debtors to re-solicit the votes of Holders of Claims and Interests in Class 1, Class 2, or Class 6 against the Debtors under section 1127 of the Bankruptcy Code, this Plan shall control solely with respect to such provision giving rise to such material conflict.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of this Plan and shall control and take precedence.

Section 11.19  *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Section 11.20  *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*[Remainder of Page Intentionally Left Blank]*

**Schedule 1**

New Mezzanine Debt Loans Commitments and Equity Splits on Effective Date

## Bridge and DIP Financing Commitments ($)

| | Amount | Commitment Fee (PIK) | Accrued Interest | Conversion at Closing Date Mezzanine Loan on Account of | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Principal | Commitment Fee | Convertible Preferred |
| Total Bridge Financing Commitment | 10,000,000 | 400,000 | TBD | | | 10,400,000 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 4,613,289 | 184,532 | TBD | | | 4,797,821 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 290,400 | 11,616 | TBD | | | 302,016 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 396,311 | 15,852 | TBD | | | 412,164 |
| Goldpoint Mezzanine Partners IV LP (USD) | 4,700,000 | 188,000 | TBD | | | 4,888,000 |
| Goldpoint Private Credit Fund LP (USD) | | | | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | | | | |
| Total DIP Financing Commitment | 15,000,000 | 600,000 | TBD | 1,800,000 | 72,000 | 13,728,000 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 6,876,412 | 275,056 | TBD | | | 7,151,469 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 432,860 | 17,314 | TBD | | | 450,174 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 590,728 | 23,629 | TBD | | | 614,357 |
| Goldpoint Mezzanine Partners IV LP (USD) | 7,100,000 | 284,000 | TBD | 1,800,000 | 72,000 | 5,512,000 |
| Goldpoint Private Credit Fund LP (USD) | | | | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | | | | |
| | | | | | | |
| **Total Bridge and DIP Commitments** | **25,000,000** | **1,000,000** | **TBD** | **1,800,000** | **72,000** | **24,128,000** |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 11,489,701 | 459,588 | TBD | 0 | 0 | 11,949,289 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 723,260 | 28,930 | TBD | 0 | 0 | 752,190 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 987,039 | 39,482 | TBD | 0 | 0 | 1,026,521 |
| Goldpoint Mezzanine Partners IV LP (USD) | 11,800,000 | 472,000 | TBD | 1,800,000 | 72,000 | 10,400,000 |
| Goldpoint Private Credit Fund LP (USD) | | | | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | | | | |

## Mezzanine Loans ($)

| | Amount | Accrued Interest | Total |
| --- | --- | --- | --- |
| **Converted Mezz Loans** | | | |
| Converted 2L Principal | 39,498,978 | TBD | 39,498,978 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 18,060,573 | TBD | 18,060,573 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 1,136,886 | TBD | 1,136,886 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 1,551,519 | TBD | 1,551,519 |
| Goldpoint Mezzanine Partners IV LP (USD) | 12,500,000 | TBD | 12,500,000 |
| Goldpoint Private Credit Fund LP (USD) | 5,000,000 | TBD | 5,000,000 |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | 1,250,000 | TBD | 1,250,000 |
| Incremental Existing Lender 2L Loans | 4,089,057 | TBD | 4,089,057 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 1,880,762 | TBD | 1,880,762 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 118,391 | TBD | 118,391 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 161,570 | TBD | 161,570 |
| Goldpoint Mezzanine Partners IV LP (USD) | 1,285,556 | TBD | 1,285,556 |
| Goldpoint Private Credit Fund LP (USD) | 514,222 | TBD | 514,222 |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | 128,556 | TBD | 128,556 |
| 2L Consent Fees | 789,980 | | 789,980 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 361,211 | | 361,211 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 22,738 | | 22,738 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 31,030 | | 31,030 |
| Goldpoint Mezzanine Partners IV LP (USD) | 250,000 | | 250,000 |
| Goldpoint Private Credit Fund LP (USD) | 100,000 | | 100,000 |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | 25,000 | | 25,000 |
| **Total Converted Mezz Loans** | **44,378,014** | **TBD** | **44,378,014** |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 20,302,547 | TBD | 20,302,547 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 1,278,015 | TBD | 1,278,015 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 1,744,119 | TBD | 1,744,119 |
| Goldpoint Mezzanine Partners IV LP (USD) | 14,035,556 | TBD | 14,035,556 |
| Goldpoint Private Credit Fund LP (USD) | 5,614,222 | TBD | 5,614,222 |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | 1,403,556 | TBD | 1,403,556 |
| | | | |
| **New Money Mezz Loans** | | | |
| Rolled-up DIP Term Loans | 1,872,000 | | 1,872,000 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | | | |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | | | |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | | | |
| Goldpoint Mezzanine Partners IV LP (USD) | 1,872,000 | | 1,872,000 |
| Goldpoint Private Credit Fund LP (USD) | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | |
| New Term Loans | 23,200,000 | | 23,200,000 |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 8,704,319 | | 8,704,319 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 547,924 | | 547,924 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 747,757 | | 747,757 |
| Goldpoint Mezzanine Partners IV LP (USD) | 13,200,000 | | 13,200,000 |
| Goldpoint Private Credit Fund LP (USD) | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | |
| **Total Converted Mezz Loans** | **25,072,000** | | **25,072,000** |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 8,704,319 | | 8,704,319 |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 547,924 | | 547,924 |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 747,757 | | 747,757 |
| Goldpoint Mezzanine Partners IV LP (USD) | 15,072,000 | | 15,072,000 |
| Goldpoint Private Credit Fund LP (USD) | | | |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | | | |
| | | | |
| **Total Mezzanine Loans** | **$ 69,450,014** | | **100.0%** |
| Pemberton Strategic Credit Holdings S.A.R.L. (GBP) | 29,006,866 | | 41.8% |
| Pemberton Management Account A Holdings S.A.R.L. (GBP) | 1,825,939 | | 2.6% |
| Pemberton Managed Account B Holdings S.A.R.L. (GBP) | 2,491,876 | | 3.6% |
| Goldpoint Mezzanine Partners IV LP (USD) | 29,107,556 | | 41.9% |
| Goldpoint Private Credit Fund LP (USD) | 5,614,222 | | 8.1% |
| Hanwha Global Corporate PE Strategy Private Fund 2 (USD) | 1,403,556 | | 2.0% |

## Convertible Preferred Equity ($)

| | Amount | Accrued Interest | Promote | Total | % of Pref |
|---|---|---|---|---|---|
| **2L Contributions** | | | | | |
| Converted DIP Amounts | 24,128,000 | | 9,651,200 | 33,779,200 | 29.5% |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *11,949,289* | | *4,779,716* | *16,729,005* | *14.6%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *752,190* | | *300,876* | *1,053,066* | *0.9%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *1,026,521* | | *410,608* | *1,437,129* | *1.3%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | *10,400,000* | | *4,160,000* | *14,560,000* | *12.7%* |
| *Goldpoint Private Credit Fund LP (USD)* | | | | | |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | | | | | |
| New Money Preferred | 21,800,000 | | 8,720,000 | 30,520,000 | 26.6% |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *18,975,416* | | *7,590,166* | *26,565,582* | *23.2%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *1,194,474* | | *477,790* | *1,672,264* | *1.5%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *1,630,110* | | *652,044* | *2,282,154* | *2.0%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | | | | | |
| *Goldpoint Private Credit Fund LP (USD)* | | | | | |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | | | | | |
| **Total 2L Contributions** | **45,928,000** | | **18,371,200** | **64,299,200** | **56.1%** |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *30,924,705* | | *12,369,882* | *43,294,588* | *37.7%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *1,946,664* | | *778,666* | *2,725,330* | *2.4%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *2,656,630* | | *1,062,652* | *3,719,283* | *3.2%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | *10,400,000* | | *4,160,000* | *14,560,000* | *12.7%* |
| *Goldpoint Private Credit Fund LP (USD)* | | | | | |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | | | | | |
| | | | | | |
| **Aquiline Contributions** | | | | | |
| Aquiline Contribution - Vox | 10,550,000 | | 4,220,000 | 14,770,000 | 12.9% |
| Aquiline Contribution - RevoPay Debt | 21,644,463 | TBD | 8,657,785 | 30,302,248 | 26.4% |
| Aquiline Contribution - RevoPay Equity | 3,800,000 | | 1,520,000 | 5,320,000 | 4.6% |
| **Total Aquiline Contributions** | **35,994,463** | **TBD** | **14,397,785** | **50,392,248** | **43.9%** |
| | | | | | |
| **Total Convertible Preferred Equity** | | | | **$ 114,691,448** | **100.0%** |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | | | | *43,294,588* | *37.7%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | | | | *2,725,330* | *2.4%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | | | | *3,719,283* | *3.2%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | | | | *14,560,000* | *12.7%* |
| *Goldpoint Private Credit Fund LP (USD)* | | | | | |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | | | | | |
| *Aquiline* | | | | *50,392,248* | *43.9%* |

## Common Equity (Post Pref Conversion) ($)

| | Amount | % of PF Equity |
|---|---|---|
| **Equitized 2L Principal** | 118,496,934 | 50.8% |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *54,181,719* | *23.2%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *3,410,659* | *1.5%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *4,654,587* | *2.0%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | *37,500,000* | *16.1%* |
| *Goldpoint Private Credit Fund LP (USD)* | *15,000,000* | *6.4%* |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | *3,750,000* | *1.6%* |
| | | |
| **Convertible Preferred Equity** | | |
| New Money Preferred | 64,299,200 | 27.6% |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *43,294,588* | *18.6%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *2,725,330* | *1.2%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *3,719,283* | *1.6%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | *14,560,000* | *6.2%* |
| *Goldpoint Private Credit Fund LP (USD)* | | |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | | |
| Aquiline Contributions | 50,392,248 | 21.6% |
| **Total Convertible Preferred Equity** | **114,691,448** | **49.2%** |
| | | |
| **Total Common Equity** | **$ 233,188,383** | **100.0%** |
| *Pemberton Strategic Credit Holdings S.A.R.L. (GBP)* | *97,476,306* | *41.8%* |
| *Pemberton Management Account A Holdings S.A.R.L. (GBP)* | *6,135,989* | *2.6%* |
| *Pemberton Managed Account B Holdings S.A.R.L. (GBP)* | *8,373,839* | *3.6%* |
| *Goldpoint Mezzanine Partners IV LP (USD)* | *52,060,000* | *22.3%* |
| *Goldpoint Private Credit Fund LP (USD)* | *15,000,000* | *6.4%* |
| *Hanwha Global Corporate PE Strategy Private Fund 2 (USD)* | *3,750,000* | *1.6%* |
| *Aquiline* | *50,392,248* | *21.6%* |